**PUBLIC CITIZEN, et al., Plaintiffs,**

v.

**David A. STOCKMAN, Director, Office of Management and Budget, Defendant.**

**Civ. A. No. 81–2659.**

United States District Court, District of Columbia.

Dec. 4, 1981.

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

THOMAS A. FLANNERY, District Judge.

I. *Introduction*

This matter comes before the court on plaintiffs' motion for a preliminary injunction. Plaintiffs seek to enjoin the defendant, the Director of the Office of Management and Budget, from refusing to make available certain funds appropriated by Congress in its emergency Continuing Resolution for the first fifty-one days of fiscal year 1982, October 1 through November 20, 1981. For the reasons expressed below, the motion for preliminary injunction is denied.

II. *Facts*

On September 24, 1981, President Reagan transmitted to Congress a revised budget proposal for fiscal year 1982. Because Congress recognized it would not be able to fully evaluate the proposed budget by the October 1 deadline prescribed in the Congressional Budget and Impoundment Control Act of 1974, 31 U.S.C. § 1321, it passed the 1982 Continuing Resolution, Pub.L. 97–51, 95 Stat. 958 ("CR"). The CR, signed into law by the President on October 1, 1981, is an emergency mechanism for funding executive operations while Congress deliberates about a comprehensive appropriations package. The CR authorized agencies to incur obligations, in many instances, at levels higher than those Congress targeted in the Reconciliation Act, 31 U.S.C. § 1322 *et seq.* (1981), or in the President's revised budget request. Under the CR, funds spent during the fifty-one day period are to be deducted from the total amount subsequently appropriated for fiscal year 1982 in a comprehensive appropriations act.

On October 7, 1981, OMB issued Bulletin No. 82–1 ("Bulletin"), which provided agencies with instructions for preparing and submitting requests for appropriations. In relevant part, the Bulletin required that agencies propose deferrals of funds appropriated in the CR so as to limit spending rates to those prescribed in the President's revised budget proposal. The stated purpose of this portion of the Bulletin was to

David C. Vladeck, Alan B. Morrison, Public Citizen Litigation Group, Washington, D. C., for plaintiffs.

Whitney Adams, Asst. U. S. Atty., Civil Division, Washington, D. C., for defendant.

provide for the continued operation of the government in a manner that does not preclude Congressional options in formulating final appropriations actions for the fiscal year. The Congress has stated on many occasions that rates of operation under continuing resolutions are to be interpreted as mandatory spending levels. The Congress and the President expect departments and agencies to avoid the obligation of funds under continuing resolutions at rates that would impinge on discretionary decisions otherwise available to the Congress while the Congress is considering its options, including the President's budget request and its own targets established in the first concurrent budget resolution for fiscal year 1982. Bulletin at 1.

In accordance with the policy expressed in the Bulletin and the Impoundment Control Act, 31 U.S.C. § 1400 *et seq.* (Supp. 1976) ("ICA"), six special "messages" have been sent to Congress detailing the deferrals proposed by the affected agencies. The defendant has submitted affidavits indicating that all proposed deferrals have been processed by OMB and forwarded to Congress. *See* Dame Affid. ¶¶ 9–11. Plaintiff maintains that certain deferrals have not been expressly declared but offers no evidence to support this contention.

The messages transmitted to Congress described the amounts deferred, the programs impacted and the sphere of program operations that would be affected by the deferral. In addition, each deferral message stated that the deferral would remain in effect for a period "not beyond the expiration of the Continuing Resolution or any extension thereof." The CR was originally scheduled to expire on November 20, 1981, but has recently been extended until December 15, 1981. Finally, consistent with the policy rationale voiced in the OMB Bulletin, the President stated that

these deferrals are intended to preserve Congressional options to act favorably on the proposals for reductions in fiscal year 1982 budget authority that I announced on September 24, 1981, and subsequently

transmitted to the Congress. These deferrals recognize the intent of Congress, reaffirmed during House and Senate action on the Continuing Resolution, that amounts provided in Continuing Resolutions are ceilings, not mandatory spending levels.

Second Special Message of the President, October 20, 1981, at 1.

The special messages were sent on October 1, October 20, October 23, October 29, November 6, and November 13, 1981, reporting 192 deferrals totaling approximately two billion dollars. The central concern of the instant suit is deferrals described in the messages transmitted to Congress on October 20 and 23. On October 20, OMB notified Congress it was initiating 56 deferrals of fiscal year 1982 funds, totaling $95.1 million. On October 23, OMB notified Congress of deferrals covering 72 programs totaling $482.5 million. It is mainly as a result of this category of deferrals that plaintiffs claim they will be injured. The programs affected include funds withheld from the Department of Housing and Urban Development's Housing for the Elderly Fund, the National Park Service and the Department of Agriculture's flood control program.

The ICA directs the Comptroller General to analyze executive budget actions and report to Congress whenever he concludes that an executive action violates the terms of the Act. 31 U.S.C. § 1405(a). Specifically, the Comptroller General is directed to report to the Congress when an executive withholding has been erroneously classified as a deferral rather than a rescission. 31 U.S.C. § 1405(b). Further, the Comptroller General is authorized to bring suit to enforce the ICA twenty-five days after he/she submits an explanatory statement of the basis of such a suit to both houses of Congress. 31 U.S.C. § 1406. As of this writing, the Comptroller General has not reported to Congress that any of the deferrals enacted by the defendant violate the ICA and has expressed no intention to file an enforcement action in federal court.

III. *Discussion*

█ The factors to be considered in granting preliminary injunctive relief are set out in *Virginia Petroleum Jobbers Assoc. v. FPC*, 259 F.2d 921, 925 (D.C.Cir.1958) as (1) the likelihood that the petitioner will prevail on the merits; (2) the irreparable injury to the petitioner if the injunction is denied; (3) the harm to other interested parties if the injunction is granted; and (4) the dictates of the public interest. *See also Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*, 559 F.2d 841 (D.C.Cir.1977).

A) *Likelihood of Success on the Merits*

Plaintiffs contend that the OMB Bulletin and subsequent deferrals transmitted to Congress are not authorized by law and violate the letter and purpose of the ICA. The principal issue before the court, as plaintiffs' reply memorandum acknowledges, is whether the withholdings ordered by OMB in Bulletin No. 82–1 have properly been labeled deferrals or whether they are, in fact, rescissions under the provisions of the ICA. *See* Plaintiffs' Reply Memorandum at 1. Rescissions are permanent withholdings of appropriated funds and must be proposed by a special Presidential message to the Congress. Rescissions do not become effective unless Congress approves the proposal by enactment of a rescission bill. 31 U.S.C. § 1402. Deferrals, on the other hand, are temporary withholdings of budget authority. Deferrals must also be reported by a special Presidential message, 31 U.S.C. § 1403(a), but are automatically effective unless either house passes an impoundment resolution disapproving the withholding. 31 U.S.C. § 1403(b).

Plaintiffs have not demonstrated a substantial likelihood of success on the merits because (1) the court has serious doubts that the ICA creates a private right of action to challenge whether withholdings are deferrals or rescissions and, even if there is such a right of action, (2) the withholdings involved appear to be valid deferrals under the ICA.

1) *The ICA Does Not Create a Private Right of Action*

█ As noted, the gravamen of plaintiff's complaint is that the defendant has violated the Impoundment Control Act by treating certain withholdings as deferrals rather than rescissions. An analysis of the ICA and its underlying purposes, however, reveals that Congress did not intend to create a private right of action to police against transgressions of the Act by the executive.

█ The ICA does not expressly vest in any person besides the Comptroller General the right to bring suit to enforce the Act's provisions. The seminal case of *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975) delineated a number of relevant factors to be considered in determining whether a private remedy is implicit in a statute not expressly providing one. First, the court must consider whether plaintiff is "one of the class for whose *especial* benefit the statute was enacted." *Id.* (Emphasis in original), quoting *Texas & Pacific R. Co. v. Rigsby*, 241 U.S. 33, 39, 36 S.Ct. 482, 484, 60 L.Ed. 874 (1916). Second, the court must discern whether there is any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one. Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy. Finally, the court should analyze whether the cause of action is one historically relegated to state law.

A number of recent Supreme Court cases have clarified the purpose of the four factor analysis described in *Cort*. The essential question to be answered is whether "Congress *intended* to create the private remedy asserted." *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 15, 100 S.Ct. 242, 245, 62 L.Ed.2d 146 (1979) (Emphasis added); *see California v. Sierra Club*, 451 U.S. 287, 293, 101 S.Ct. 1775, 1779, 68 L.Ed.2d 101 (1981) ("the ultimate issue is whether Congress intended to create a private right of action"); *Universities Research Assn. v. Coutu*, 450 U.S. 754, 101 S.Ct. 1451, 1458, 67 L.Ed.2d 662 (1981); *Touche Ross & Co. v. Reddington*, 442 U.S.

560, 566, 568, 99 S.Ct. 2479, 2484, 2485, 61 L.Ed.2d 82 (1979); *Cannon v. University of Chicago,* 441 U.S. 677, 688, 99 S.Ct. 1946, 1953, 60 L.Ed.2d 560 (1979). The Court has shifted away from the focus in earlier cases, *see, e.g. J. I. Case v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), upon the desirability of implying the private right of action in order to effectuate the purposes of a given statute. *California v. Sierra Club,* 451 U.S. at 297, 101 S.Ct., at 1781 (the courts "will not engraft a remedy on a statute, no matter how salutary, that Congress did not intend to provide"); *Transamerica, supra,* 444 U.S. at 15, 100 S.Ct. at 245.

In determining whether Congress intended to create a private right of action, it is appropriate to first scrutinize the language of the statute itself. *See Touche Ross & Co., supra,* 442 U.S. at 568, 99 S.Ct. at 2485; *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1976); *Piper v. Chris-Craft Industries, Inc.,* 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1976). There is nothing on the face of the ICA which suggests that Congress intended that private parties should be permitted to enforce the Act's directives. In fact, an altogether contrary conclusion must be drawn from the language of the statute.

Section 1001 of the Act provides, in pertinent part, that "nothing contained in this Act ... shall be construed as ... *affecting in any way* the claims or defenses of any party to litigation concerning any impoundment." 31 U.S.C. § 1400(3) (Emphasis supplied). This section represents a rather blatant disclaimer of any Congressional design to provide for a private right of action. *See Rocky Ford Housing Authority v. United States Department of Agriculture,* 427 F.Supp. 118, 134 (D.D.C.1977); Mills & Munselle, *Unimpoundment: Politics and the Courts in the Release of Impounded Funds,* 24 Emory L.J. 313, 339–41 (1975). To be successful in this suit on the merits, plaintiffs would obviously have to demonstrate that the withholdings at issue are rescissions and not deferrals. Thus, the court's assessment of the validity of plaintiff's challenge to the executive's impound-

ment actions and any of the defenses thereto would necessarily be "affected" by the provisions of the statute, namely, the precise scope and interrelationship of sections 1402 and 1403. Accordingly, allowing this private action to proceed would be inconsistent with the plain meaning of section 1400.

■ Another provision of the ICA strongly implies Congressional intent not to create a private right of action. As noted above, section 1406 expressly authorizes the Comptroller General to bring suit in federal district court in the District of Columbia when he determines that appropriations are being withheld in contravention of the Act; the section specifically emphasizes the Comptroller General's authority to sue in order to correct erroneous classifications of rescissions as deferrals. It is a fundamental axiom of statutory construction that where a statute "limits a thing to be done in a particular mode, it includes the negative of any other mode." *Botany Mills v. United States,* 278 U.S. 282, 49 S.Ct. 129, 73 L.Ed. 379 (1929). When applied to the question of legislative intent to create a private right of action, this general axiom suggests that where a "statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *Transamerica, supra,* 444 U.S., at 19, 100 S.Ct., at 247. Section 1406 not only establishes a particular remedy for the ICA's enforcement, suits by the Comptroller General, but goes even further and prescribes a specific format for the institution of such suits. The Comptroller General must furnish an explanatory statement of the circumstances giving rise to the perceived need for judicial involvement and wait for the expiration of twenty-five calendar days before proceeding to court. 31 U.S.C. § 1406. In light of such careful crafting of one means for enforcing the ICA's provisions, it is highly improbable that "Congress absentmindedly forgot to mention an intended private action." *Cannon v. University of Chicago, supra,* 441 U.S. at 742, 99 S.Ct. at 1981 (Powell, J., dissenting). Therefore, the language of the

ICA itself indicates Congressional intent not to provide for private rights of action.

The legislative history of the statute is similarly unsupportive of any contention that Congress desired that private suits supplement enforcement actions by the Comptroller General. The only pertinent legislative history furnished by plaintiffs is a statement made by Senator Ervin on the floor of the Senate that the ICA "is not intended to infringe the right of any other party to initiate litigation." 120 Cong.Rec. 20465 (1974). *See Fontaine v. Donovan,* slip op. at 8 n.3, No. 81–789 (D.D.C. May 21, 1981), *aff'd in part and rev'd in part sub nom. West Central Missouri Rural Development Corp. v. Donovan,* 659 F.2d 199 (D.C. Cir.1981) (per curiam). This single remark on the floor of the Senate is of little assistance to plaintiffs. First, Senator Ervin's statement can easily be read as simply reiterating the thrust of section 1400 that the ICA is not intended to either negate or create private rights of action; thus, if a private right is furnished by another statute, the ICA would not "infringe on the right."

Second, even if Senator Ervin's statement is appropriately read as implying that private suits are permissible to enforce the ICA, the courts have frequently admonished that the statements of a single legislator, even the statute's sponsor, are not particularly valuable in assessing legislative intent. *See, e.g., Chrysler Corp. v. Brown,* 441 U.S. 281, 311, 99 S.Ct. 1705, 1722, 60 L.Ed.2d 208 (1979). Moreover, Senator Ervin's remark should have even less influence that it ordinarily would in light of the fact that he was an architect of the Senate bill, S. 1541, which reflected an extremely narrow view of allowable Presidential impoundment authority. This view was largely rejected by the Conference Committee in favor of the House bill's considerably broader scope for executive withholding actions. Conf.Rep.No.93–924 (June 12, 1974), U.S. Code Cong. & Admin.News 1974, p. 3462 (hereinafter "Conf. Rep."). Thus, Senator Ervin's statement disclaiming incursions on private rights of action was made in the context of deliberations on a bill virtually eliminating executive withholding actions of any type. In such a context, private suits would appear to be a logical and, perhaps, necessary means to curb executive excesses in the budgetary sphere. Since the Senate bill was rejected, however, in favor of legislation providing for relatively broad Presidential impoundment authority, Senator Ervin's remark has virtually no relevance to the court's investigation of legislative intent to create a private right of action in the ICA as it was ultimately adopted. Such intent is more aptly sought in the statements of sponsors whose views on the scope of executive withholdings were largely vindicated, the architects of the House bill, H.R. 7130. As the foregoing discussion would suggest, these Congressmen expressed a strong desire to limit judicial intervention in budgetary matters to occasions when Congress has first determined that such intervention is required. For example, Representative Bolling, a leading sponsor of the House bill, stated that

> The procedure embodied in the bill would vest in the Congress the final determination of its own intentions and its own priorities in cases where actions taken by the Executive place them in doubt and it should be clear that neither a Federal Court nor any other body is as well qualified to determine the intentions and priorities of the Congress as the Congress itself.

119 Cong.Rec. 25845 (1973). Similarly, Representative McFall remarked that enactment of the ICA would "obviate the need for piecemeal judicial actions .... Congress should not let the courts act for it." 119 Cong.Rec. 25566 (1973).

The theme of limited judicial intervention resounds clearly throughout the relevant legislative history. As Judge Pratt recognized, the ICA, in its final form, was enacted "in order to *strengthen Congressional control* over the budget process, to allow appropriations to be modified in light of subsequent changes in fiscal and other policy, and to establish an *orderly process for the resolution of impoundment disputes with the President." Fontaine v. Donovan,*

*supra*, slip op. at 9 (Emphasis supplied). Section 1016 of the Act, authorizing suits by the Comptroller General following Congress' tacit approval, was part of the scheme Congress selected for establishing its role as primary arbiter of budget disputes with the Executive and, concomitantly, narrowly circumscribing judicial involvement in such disputes. Conf.Rep. at 3616–18; *Rocky Ford Housing Authority v. United States Department of Agriculture, supra*, 427 F.Supp. at 134.

This discussion of the ICA's legislative history reveals that a private right of action to enforce the Act was not intended by Congress. Such an action would directly conflict with Congress' desire to narrowly limit judicial involvement in the Act's enforcement. Private citizens would be invited to proceed directly to court to seek judicial assessment of the legality of executive impoundment decisions under the Act; this is precisely the type of "piecemeal" adjudicatory process Congress sought to avoid. By implication, the scheme Congress did purposefully choose for selectively triggering judicial review of controversies arising under the Act, embodied in section 1406, would be completely undermined if the courthouse doors were swung open to private litigants; in direct contravention of its intent, Congress would be stripped of its primary control over the resolution of executive-legislative budgetary disputes.

Thus, an analysis of the pertinent legislative history squarely supports the court's reading of the statute itself, i.e., that the Congress did not intend to create a private right of action. As noted earlier, recent judicial pronouncements have declared that the court's inquiry is at an end once a clear finding of legislative intent is made; contrary to the implication in earlier decisions, the court is not required to make an independent assessment of the desirability of implying a private right of action. *See California v. Sierra Club, supra*, 451 U.S. at 287, 101 S.Ct. at 1779. However, even if

an independent assessment were to be made in the case at hand, it would not avail the plaintiffs. As indicated above, the ICA was not enacted to safeguard the interests of private citizens in the continued disbursement of funds originally appropriated by Congress. Plaintiffs are not members of an "especial" class for whose benefit the ICA was enacted. *See Cort v. Ash, supra*, 422 U.S. at 78, 95 S.Ct. at 2087. Thus, allowing plaintiffs to bring suit to compel distribution of funds appropriated under the Continuing Resolution would not effectuate any purpose Congress had in adopting the ICA.

Rather, an implied right of action would represent a great disservice to the objectives which underlie the ICA. Congress sought to retain principal dominion over the impoundment process and crafted a flexible scheme for involving the judiciary in disputes spawned by the Act's provisions. The Comptroller General's determination as to whether to bring suit, and Congress' decision whether to sanction the institution of such a suit, will obviously turn on a host of politically sensitive factors, including the potential impact that such a suit will have on the legislative-executive relationship. *See Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 222, 94 S.Ct. 2925, 2932, 41 L.Ed.2d 706 (1974). The value of section 1406 will be lessened considerably if private litigants are free to embroil the judiciary in controversies arising under the ICA; the courts would be forced to rule on the legality of executive withholdings in the absence of Congress' preliminary assessment of the crucial political dimensions involved in such a suit. Thus, even an autonomous consideration of whether a private right of action would further Congress' purposes suggests that such an action should not be implied under the ICA. Overall, the court concludes that there is scant likelihood that plaintiffs will ultimately prevail in demonstrating that a private right of action to enforce the Impoundment Control Act should be implied.[1]

---

1. Plaintiffs argue that even if the ICA itself does not provide a private right of action, their suit can proceed under section 706 of the Administrative Procedure Act, which provides that a reviewing court shall hold unlawful agency actions found to be not in accordance

### 2) The ICA Authorizes the Withholdings in Controversy

Even if the court were to imply a private right of action under the ICA, it appears that the withholdings at issue are valid deferrals. Section 1013 of the Act provides that whenever the President or the Director of the OMB proposes to defer any budget authority provided for a specific purpose or project, the President must transmit to both houses of Congress a special message specifying the amount deferred, the specific projects involved, the reasons for the proposed deferrals and other related information. The section also provides that any amount of budget authority proposed to be deferred shall be made available for obligation immediately only if either house of Congress passes an impoundment resolution disapproving the proposed deferral. 31 U.S.C. § 1403(b). The messages transmitted to Congress comport with the requirements of section 1403 in all respects. Neither house of Congress has passed a resolution disapproving the withholdings at issue. Accordingly, if the withholdings are, in fact, deferrals within the contours of section 1403, it is clear that the defendant's impoundments are authorized by the ICA.[2]

Plaintiffs argue that the withholdings are not deferrals authorized by section 1403 because they are actually rescissions within the meaning of section 1402. As noted, funds which the executive proposes to rescind must be made available unless Congress enacts a bill approving the rescission proposal. 31 U.S.C. § 1402(b). The only discernible standard within the Act for distinguishing between deferrals and rescissions concerns the duration of the relevant withholding. Section 1403 provides that "a deferral may not be proposed for any period of time extending beyond the end of the fiscal year in which the special message proposing the deferral is transmitted to the House and Senate." 31 U.S.C. § 1403(a). In other words, deferral actions are temporary withholdings, proposing that funds not be disbursed until later in the fiscal year and rescissions are permanent withholdings, proposing that funds never be disbursed.

Applying this standard, it seems evident that the withholdings in controversy are deferrals. By their terms, the withholdings will only be in effect through the duration of the Continuing Resolution; presently, the CR is scheduled to expire on December 15, 1981. There is nothing in the messages sent to Congress which suggests that funds will be withheld beyond the termination of fiscal year 1982. Further, even if the CR were indefinitely extended (and there is no evidence in the record to suggest that this will occur), OMB instructions require agencies to monitor any program in which funds have been deferred to ensure that the funds

---

with law. 5 U.S.C. § 706. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 318, 99 S.Ct. 1705, 1726, 60 L.Ed.2d 208 (1979). This argument is misplaced. Section 706 simply furnishes the scope of judicial review of agency actions which plaintiffs have standing to challenge under section 702 of the APA. That section states that "a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute is entitled to judicial review thereof." 5 U.S.C. § 702. This test of standing is "equivalent to the requirement that the complainant's interest fall within the zone of interests sought to be protected by the statute." *EDF v. Hardin*, 428 F.2d 1093, 1097 & n.16 (D.C.Cir.1970); *see Barlow v. Collins*, 397 U.S. 159, 164–65, 90 S.Ct. 832, 836, 25 L.Ed.2d 192 (1970); *Association of Data Processing Service Organizations v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

The court's preceding discourse on private rights of action essentially pretermits any contention that plaintiff's interest in preserving the flow of appropriations is within the zone of interests intended to be protected by the ICA. *See* discussion at pp. 829–830 *supra*. The statute was clearly enacted to safeguard Congress' interests, not those of private citizens. Since plaintiffs do not have standing under the APA to challenge defendant's withholdings, the scope of review of agency actions encapsulated in section 706 is obviously of no consequence to this case.

2. In their complaint, plaintiffs apparently contended that the defendant needed an independent source of statutory authority, besides the ICA, in order to defer the funds in controversy. *See* Complaint ¶¶ 14–16. Plaintiffs have correctly abandoned any such contention in their latest pleading and in oral argument. Plaintiff's Reply Memorandum at 1 n.1; *see Fontaine v. Donovan, supra*, slip op. at 14–15.

will be released in time to be effectively used before the end of the fiscal year. OMB Circular No. A-34 § 42.6. Thus, the defendants have, by all appearances, transmitted messages to Congress proposing *temporary* delays in funding obligations, i.e., deferrals.

To escape this conclusion, plaintiffs argue that while the withholdings may have certain superficial attributes of deferrals, they are still, in reality, rescissions. Since the President desires that Congress will ultimately adopt his budget recommendations, the withholdings in question are basically proposals that budget authority be "rescinded for fiscal policy" reasons; the President essentially intends that the funds in controversy not be expended during fiscal year 1982.

This argument makes the fundamental error of confusing the President's overall appropriation proposal with the withholding actions presently at issue. Surely, the President's overall appropriation package seeks to have Congress adopt permanent funding levels substantially below those delineated in the CR. Just as clearly, the withholdings at issue do not *themselves* propose permanent rescissions in budget authority, but simply seek to leave intact Congress' option to adopt the spending levels contained in the President's revised budget proposal. It is undisputed that unless expenditures for the CR period are limited in accordance with the deferrals in question, the Congress will be practically foreclosed from accepting spending rates prescribed in the President's budget package. Thus, the defendant's withholdings merely seek to freeze certain appropriations during the CR period, while Congress reflects on the President's overall budget recommendations. The withholdings undoubtedly constitute *temporary* delays in appropriation disbursements, regardless of the defendant's subjective desire that the funds involved never actually be spent.[3] In the court's view, the budgetary actions in controversy are deferrals, not rescissions and comport completely with the requirements of the Impoundment Control Act.

### B) *Irreparable Injury to the Plaintiffs*

Plaintiffs have not made a strong showing of irreparable injury. Plaintiffs do not complain of any harm that will result during the CR period that cannot be remedied at a later time. Plaintiffs have not demonstrated that the funds at issue must be spent immediately or even in the near future for the full benefits of those expenditures to be realized. Further, as noted, OMB has ordered agencies to ensure that the deferred resources be expended so as to ensure their utility is not forfeited; there is no evidence that this instruction is not being complied with. Finally, even if plaintiffs are correct in asserting that the withholdings in question are rescissions, the resulting harm is that the affected funds will *never* be spent and not that the funds will be withheld for a particular portion of fiscal year 1982. Thus, plaintiffs do not need extraordinary preliminary relief at this time in order to preserve the remedies they may ultimately be entitled to. *If* plaintiffs should prevail on the merits, a dubious prospect, injunctive relief compelling the defendant to release the monies in controversy for disbursement by the impacted agencies will satisfactorily remedy any injury plaintiffs may otherwise suffer.

---

**3.** As the preceding discussion implies, the plaintiffs' effort to portray the withholdings as rescissions on the basis of the President's subjective intention that the funds in issue never be spent is patently unsupportable. Not only would an inquiry into the executive decisionmaker's actual state of mind be practically infeasible, it would completely confuse the distinction Congress has drawn between deferrals and rescissions. A brief hypothetical illustrates this point. Suppose the President proposes a *weeklong* deferral of funds for a partic- ular program. The purpose of the deferral is to give the President time to prepare a rescission proposal before any such proposal becomes moot. Under the formulation propounded by the defendants, the deferral proposal would be illegal because the President actually desired that the funds involved not be ultimately expended. An obvious deferral, seeking a temporary withholding of precise duration and trivial impact would be invalidated simply on the basis of the Executive's subjective intent.

**C)** *Irreparable Injury to the Defendants and the Public Interest*

The public interest in this case will best be served by denying plaintiff's request for a preliminary injunction. As noted, the withholdings at issue serve the general function of retaining for Congress the maximum number of options for disbursing appropriated resources throughout the fiscal year. The deferrals guarantee that Congress will not be precluded from adopting the spending levels recommended by the President or targeted by the Congress in the Reconciliation Act. Section 105 of the CR provides that any amount of budget authority obligated under the CR will be deducted from the amount ultimately provided for fiscal year 1982 in a comprehensive appropriation measure. Thus, if Congress were to spend at the levels appropriated in the CR but then adopt the President's proposal (or *any* appropriation package with spending levels below those contained in the CR), available resources would be depleted before the fiscal year elapses. Deferring the expenditures in question is the only means to insure that Congress retains adequate discretion to select any one of the continuum of appropriation proposals presently under scrutiny. Moreover, as emphasized, above there is no evidence that funds being withheld cannot be effectively utilized *if* Congress subsequently adopts funding levels equivalent to those established in the CR. Accordingly, the public interest in this matter clearly favors denial of the preliminary injunction.

This discussion, of course, also indicates that the defendant, as an agent of the President, will suffer irreparable injury if the preliminary injunction is granted. If the withholdings in controversy are invalidated Congress' power to ratify the President's budget package will be severely hampered. The harm that will be visited upon the President and the defendant, in terms of increased risk of rejection of the overall spending levels requested would be substantial and irreparable.

**IV.** *Conclusion*

Plaintiffs have failed to persuade the court that there is any reasonable likelihood they will ultimately prevail on the merits because (1) it is unlikely that Congress intended that a private right of action be created to remedy transgressions of the Impoundment Control Act and (2) the withholdings at issue appear to be legally valid deferrals within the scope of section 1013 of the ICA. Further, a balancing of equities clearly favors rejection of the motion for preliminary injunction. Plaintiffs will not be irreparably injured by denial of a preliminary injunction, since it is not necessary that the funds in question be expended immediately or in the near future in order for any injuries to the plaintiffs to be remedied. On the other hand, both the public interest and the defendant will be irreparably injured if the preliminary injunction is granted because the forced disbursement of the funds will drastically curtail Congress' options to adopt comprehensive funding levels for fiscal year 1982 that are inconsistent with those established in the Continuing Resolution. Therefore, the motion for preliminary injunction is denied.

An appropriate Order accompanies these Findings of Fact and Conclusions of Law.