The HONDO NATIONAL BANK,
Plaintiff-Appellant,

v.

GILL SAVINGS ASSOCIATION, et al.,
Defendants-Appellees.

No. 81–1585.

United States Court of Appeals,
Fifth Circuit.

Jan. 31, 1983.

Young, Taylor, Murray & Richards, Inc., Jess W. Young, William O. Murray, Jr., San Antonio, Tex., DeHay & Blanchard, John P. Higgins, Dallas, Tex., for plaintiff-appellant.

Kenneth L. Bennight, Jr., San Antonio, Tex., for Gill Sav. Ass'n, et al.

Thomas M. Pollan, Catherine Fryer, Asst. Attys. Gen., Austin, for Vandygriff.

Before THORNBERRY, JOHNSON and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Hondo National Bank appeals from dismissal of its suit against Gill Savings Association and the Texas Savings and Loan Commissioner seeking injunctive relief and damages for a state claim of libel and an alleged violation of 12 U.S.C. § 1832(a), which prohibits certain interest-bearing demand accounts. Finding, as did the district court, that no implied private right of action exists under § 1832 and that an effort to obtain its enforcement via a Texas statute was properly dismissed, we affirm.

### Facts and Disposition Below

In early January 1980, defendant Gill Savings Association, a savings and loan chartered by the state of Texas and insured by the Federal Savings and Loan Insurance Company, established a dual account plan called "Draft/Chek." Under this arrangement, each participating customer opened a savings account and a demand account that always had a zero balance. When the customer wrote a draft on the demand account, funds to cover the draft were automatically transferred from the savings account to the demand account. Gill offered this service to all its customers including individuals and business entities.

On July 17, 1980, Joseph Settles, president of the Federal Home Loan Bank Board of Little Rock, advised Texas savings and loan associations that automatic fund transfer accounts violated 12 U.S.C. § 1832. This statute prohibited depository institutions from offering interest-bearing checking accounts until December 31, 1980, when it would become legal to offer such accounts to depositors other than business entities.[1] In September 1980, Gill altered its draft instruments to make them non-negotiable but otherwise continued its practices. Neither the FSLIC nor the FHLBB instituted any action against Gill.

On November 4, 1980, plaintiff Hondo National Bank filed its complaint and an application for temporary restraining order, alleging that Gill had violated § 1832 and had committed libelous acts. Hondo also sought an order directing Texas Savings and Loan Commissioner Alvis Vandygriff to enforce the statute against Gill. The district court denied the petition for a TRO

1. As enacted in 1973, 12 U.S.C. § 1832 provided as follows:

(a) No depository institution shall allow the owner of a deposit or account on which interest or dividends are paid to make withdrawals by negotiable or transferable instruments for the purpose of making transfers to third parties, except that such withdrawals may be made in the States of Massachusetts and New Hampshire.

(b) For purposes of this section, the term "depository institution" means—

(1) any insured bank as defined in section 1813 of this title;

(2) any State bank as defined in section 1813 of this title;

(3) any mutual savings bank as defined in section 1813 of this title;

(4) any savings bank as defined in section 1813 of this title;

(5) any insured institution as defined in section 1724 of this title; and

(6) any building and loan association or savings and loan association organized and operated according to the laws of the State in which it is chartered or organized; and for purposes of this paragraph, the term "State" means any State of the United States, the District of Columbia, any terri-

tory of the United States, Puerto Rico, Guam, American Samoa, or the Virgin Islands.

(c) Any depository institution which violates this section shall be fined $1,000 for each violation.

Connecticut, Rhode Island, Maine, and Vermont were added to the statute in 1976, New York was added in 1978, and New Jersey was added in 1979.

Effective December 31, 1980, § 1832(a) was amended as follows:

(a)(1) Notwithstanding any other provision of law but subject to paragraph (2), a depository institution is authorized to permit the owner of a deposit or account on which interest or dividends are paid to make withdrawals by negotiable or transferable instruments for the purpose of making transfers to third parties.

(2) Paragraph (1) shall apply only with respect to deposits or accounts which consist solely of funds in which the entire beneficial interest is held by one or more individuals or by an organization which is operated primarily for religious, philanthropic, charitable, educational, or other similar purposes and which is not operated for profit.

and later denied a motion for a preliminary injunction on the ground that it lacked jurisdiction under 12 U.S.C. § 1730(k)(2).[2] On January 20, 1981, Hondo moved for partial summary judgment, requesting that the court enjoin Gill from offering interest-bearing checking accounts to business entities and to award damages for Gill's violation of § 1832 both before and after December 31, 1980.[3] The court, however, granted Gill's motion to dismiss on the ground that § 1832 afforded Hondo no implied private right of action and dismissed the remaining claims on jurisdictional grounds. Hondo appeals.

### Implied Private Right of Action Under § 1832

Marching against the Supreme Court's retreat from the implication of statutory rights of action,[4] Hondo asserts that § 1832 creates an implied private right of action in favor of a commercial bank against its competitors. According to *Touche Ross & Co. v. Redington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979), the question whether a statute creates a private right of action is "one of congressional intent, not one of whether this court thinks that it can im-

prove on the statutory scheme that Congress enacted into law." *Id.* at 578, 99 S.Ct. at 2490. In ascertaining congressional intent, the Court considered "the first three factors discussed in *Cort [v. Ash]*—the language and focus of the statute, its legislative history, and its purpose." *Id.* at 575–76, 99 S.Ct. at 2488–89.[5]

The Supreme Court recently repeated the importance of ascertaining congressional intent in *Merrill Lynch, Pierce, Fenner & Smith v. Curran,* 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982). The Court there faced the question whether an implied private right of action existed under a 1974 amendment to the Commodities Exchange Act (CEA). Noting that "[t]he key to this case is our understanding of the intent of Congress in 1974 when it comprehensively reexamined and strengthened" the CEA, the Court gave further content to its mandated inquiry into intent:

In determining whether a private cause of action is implicit in a federal regulatory scheme when the statute by its terms is silent on that issue, the initial focus must be on the state of the law at the time the legislation was enacted.

**2.** Hondo argues that the district court had jurisdiction to grant injunctive relief. As we otherwise make plain, the denial of injunctive relief was proper, not for lack of jurisdiction, but because Hondo has no private right of action. That is, Hondo's complaint stated no claim.

**3.** In the spring of 1982 Gill stopped offering automatic fund transfer accounts to business entities. It now argues that this action moots Hondo's suit for injunctive relief. This argument, however, overlooks the impact of the "voluntary cessation" doctrine. If it is doubtful that the allegedly wrongful behavior could not reasonably be expected to recur absent an injunction, a case is not moot. *Vitek v. Jones,* 445 U.S. 480, 487, 100 S.Ct. 1254, 1260, 63 L.Ed.2d 552 (1980).

**4.** *See, e.g., Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n,* 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981); *Texas Industries, Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981); *California v. Sierra Club,* 451 U.S. 287, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981); *Universities Research Ass'n v. Coutu,* 450 U.S. 754, 101 S.Ct. 1451, 67 L.Ed.2d 662 (1981); *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S.

11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979); *Touche Ross & Co. v. Redington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). *But see Merrill Lynch, Pierce, Fenner & Smith v. Curran,* 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982).

**5.** *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), listed four factors thought to be relevant to the existence of an implied private right of action:

First, is the plaintiff 'one of the class for whose especial benefit the statute was enacted,' ...—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? ... Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? ... And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

*Id.* at 78, 95 S.Ct. at 2088 (citations omitted).

More precisely, we must examine Congress' perception of the law that it was shaping or reshaping. When Congress enacts new legislation, the question is whether Congress intended to create a private remedy as a supplement to the express enforcement provisions of the statute. When Congress acts in a statutory context in which an implied private remedy has already been recognized by the courts, however, the inquiry logically is different. Congress need not have intended to create a new remedy, since one already existed; the question is whether Congress intended to preserve the preexisting remedy.

*Id.* 102 S.Ct. at 1839 (footnote omitted). Because federal courts had recognized implied private rights of action under the CEA prior to its 1974 amendment, the Court concluded that Congress in 1974 indeed was acting "in a statutory context in which an implied private remedy already has been recognized...." Accordingly, the Court's inquiry into congressional intent focused on "whether Congress intended to preserve the preexisting remedy."

Our first focus upon the state of the law at the time of enactment quickly returns us to a traditional *Cort* analysis. Unlike the statute at issue in *Curran,* § 1832 was new legislation rather than an amendment to an act under which courts had implied a private right of action. Hondo nonetheless argues that an intent to imply a private right of action can be inferred from the existence of several cases decided before passage of § 1832 in which federal courts entertained suits by banks to enjoin their competitors' alleged violations of the National Bank Act. Section 1832, however, arose in a different legislative context from the National Bank Act. It regulates different entities under a different regulatory scheme. Attempting to describe the legal context at the time of enactment by reference to cases involving the National Bank Act is nothing more than an attempt "to

achieve like conclusions from different premises." *Rogers v. Frito-Lay, Inc.,* 611 F.2d 1074, 1082 (5th Cir.), *cert. denied,* 449 U.S. 889, 101 S.Ct. 246, 66 L.Ed.2d 115 (1980). In *Curran* terms, Congress was not acting in a statutory context in which an implied private remedy already had been recognized. Thus, our inquiry is "whether Congress intended to create a private remedy as a supplement to the express provisions of the statute" and not "whether Congress intended to preserve [a] preexisting remedy." *Curran,* 102 S.Ct. at 1839.

■ In making this inquiry, our first step is to determine whether the plaintiff is a member of the class "for whose *especial* benefit the statute was enacted." *Cort,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975) (emphasis in original). This requirement demands that we determine not whether Congress intended to aid a particular class of persons, but that we decide whether Congress intended to "create a federal right in favor of the plaintiff." *Id.* at 78, 95 S.Ct. at 2088. To this end, the Supreme Court and this circuit have focused on the "right—or duty-creating language of the statute" as "the most accurate indicator of the propriety of implication of a cause of action." *Cannon v. University of Chicago,* 441 U.S. 677, 690, 99 S.Ct. 1946, 1954, 60 L.Ed.2d 560 (1979).

■ An examination of both the original and amended § 1832 fails to reveal a defined right in favor of commercial banks against their competitors. The language of § 1832 differs from that in *Cannon,* which "explicitly conferred a right directly on a class of persons that included the plaintiff." [6] *Cannon,* 441 U.S. at 690 n. 13, 99 S.Ct. at 1954 n. 13. Nor does the language of § 1832 impose a duty upon one specific class for the benefit of another. Instead, § 1832 generally forbids depository institutions from paying interest upon certain accounts and places the duty of enforcement upon a federal agency.

---

**6.** In *Cannon* the plaintiff asserted a cause of action under a statute providing that "No person in the United States shall, on the basis of sex," be subjected to discrimination under any federally assisted education program. Section 901 of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681.

Hondo contends, however, that a private right of action ought to be implied here because § 1832's ban runs directly to the regulated entities. It thus attempts to distinguish this case from three recent decisions in which this court denied private rights of action under statutes that imposed duties of enforcement upon federal departments and agencies. *See Till v. Unifirst Federal Savings & Loan Association,* 653 F.2d 152, 158 (5th Cir.1981); *United States v. Capeletti Bros., Inc.,* 621 F.2d 1309, 1314 (5th Cir.1980); *Rogers v. Frito-Lay, Inc.,* 611 F.2d at 1078. We are not persuaded that this asserted distinction is meaningful here. Section 1832's imposition of a duty upon depository institutions rather than upon a federal agency contains no necessary implication of any intention to endow a commercial bank with a direct suit against a competitor. That is, the difference between a statute that states "no depository institution shall pay interest on certain demand deposits" and one that states "payment of interest on certain demand deposits is illegal" does not remove this case from the reasoning of *Till, Capeletti,* and *Rogers* when enforcement responsibility lies with a federal agency in both examples. Both Hondo and Gill are depository institutions and both are subject to a statutory ban that is indisputably general. In the language of the Supreme Court in *California v. Sierra Club,* 451 U.S. 287, 294, 101 S.Ct. 1775, 1779, 68 L.Ed.2d 101 (1981), "the statute states no more than a general proscription of certain activities; it does not unmistakably focus on any particular class of beneficiaries...." Indeed, this court recently denied an implied right of action under § 17(a) of the Securities Act of 1933, noting that the statutory language " 'unlawful for any person' ... merely represents a general censure of fraudulent practices." *Landry v. All American Assurance Co.,* 688 F.2d 381, 389 (5th Cir.1982).

Even a statute that specifies the limits of persons to be regulated states yet a general proscription. There is no relevant distinction between a proscription that "no person shall" and a proscription in a statute like § 206 of the Investment Advisors Act that

no "investment adviser [shall] engage in specified transactions with clients without making required disclosures." *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 16, 100 S.Ct. 242, 245, 62 L.Ed.2d 146 (1979). The Court there refused to imply a private right of action, noting that "§ 206 simply proscribes certain conduct, and does not in terms create or alter any civil liabilities. If monetary liability to a private plaintiff is to be found, it must be read into the Act." *Id.* at 19, 100 S.Ct. at 247.

The second *Cort* factor requires us to examine § 1832's legislative history to determine whether Congress intended to create or deny a private right of action. Hondo argues that the statute's legislative history demonstrates a desire to prevent some financial institutions from offering interest-bearing checking accounts in order to gain a competitive edge over commercial banks. A closer inspection of the events surrounding the initial passage of § 1832 and its subsequent amendment, however, indicates that Congress did not intend to vest commercial banks with a private remedy against their competitors.

Before passage of § 1832 in 1973, no federally-regulated financial institutions were permitted to offer demand access to interest-bearing accounts. *See* 12 U.S.C. § 371a (governing federally-regulated banks); 12 U.S.C. § 1464(b)(1) (governing federally-regulated S & L's). In the early 1970's, however, several state-chartered, nonfederally insured mutual savings banks in Massachusetts and New Hampshire began offering interest-bearing checking accounts currently known as NOW accounts. Responding to the protestations of federally-regulated institutions, Congress considered three solutions: 1) prohibiting all institutions from offering NOW accounts; 2) permitting all institutions to offer NOW accounts; 3) permitting all institutions in Massachusetts and New Hampshire only to offer NOW accounts. *See* S.Rep. No. 93–149, *reprinted in* 1973 U.S.Code Cong. & Ad. News 2014, 2015, 2025. In opting for the third alternative, Congress recognized that

the first proposal would create federal interference with independent state banks and would deprive consumers of a valuable service. *See, e.g.,* 119 Cong.Rec. 15001 (1973) (remarks of Rep. Patman); 119 Cong. Rec. 15004 (1973) (remarks of Rep. Moakley). It also recognized that the second proposal might have unknown effects on national monetary policy, competition, solvency of the financial system, depositor protection, and mortgage rates. *See* 119 Cong. Rec. 15006 (1973) (remarks of Rep. Parris). Accordingly, Congress confined the NOW account experiment to Massachusetts and New Hampshire, but permitted all financial institutions in those states to meet the competitive edge gained by the mutual savings banks. *See* 119 Cong.Rec. 28021 (Remarks of Sen. Brooke). These numerous concerns of Congress thus indicate that the protection of commercial banks was not the goal of either the extension of NOW account authority in Massachusetts and New Hampshire or the prohibition of NOW accounts in the other forty-eight states.

Finally, the 1980 Depository Institutions Deregulation Act amendment to § 1832 permitted all depository institutions to offer interest-bearing checking accounts to consumers other than business entities. By eliminating its restrictions on NOW accounts, Congress expressed an intent "to establish an alternative service whose relative value individual consumers may judge." S.Rep. No. 96–368, *reprinted in* 1980 U.S.Code Cong. & Ad.News 236, 243. To effectuate this benefit to consumers, the business entity restriction in the amended § 1832 serves to mitigate NOW accounts' upward pressure on service charges and interest rates imposed on individual consumers. This amendment is without any signal that Congress intended to provide a commercial bank with a right of action against competitors.[7]

Because there is no evidence that § 1832 was intended to create federal rights for the especial benefit of commercial banks or that Congress anticipated a private remedy, we are not required to examine the third *Cort* factor to determine whether a private remedy would be "consistent with the underlying purposes of the legislative scheme." *See California v. Sierra Club,* 451 U.S. at 298, 101 S.Ct. at 1781. Nevertheless, an examination of this factor reinforces our result. *See Landry v. All American Assurance Co.,* 688 F.2d at 390. The implication of a private right of action would risk remedial cacophony in the congressionally structured regulatory scheme for enforcing § 1832. Specifically, 12 U.S.C. § 1730(e)(1) permits the FSLIC or the FHLBB after notice and hearing to issue a cease-and-desist order against an insured institution. The agencies also can issue a temporary cease-and-desist order pending notice and hearing if the insured institution's practice is likely to cause insolvency or dissipation of assets. *See* § 1730(f)(1). If the insured institution fails to comply with these orders, the agencies can assess a civil penalty of up to $1,000 per day, *see* § 1730(k)(3)(A), or may apply to a federal district court for enforcement of the orders. *See* §§ 1730(f)(3), 1730(k)(2). Moreover, the provision in § 1832(c) for specifically set $1,000 penalties is inconsistent with an unchecked damage, remedy. *Cf. Merrill Lynch, Pierce, Fenner & Smith v. Curran,* 102 S.Ct. at 1852–53 (Powell, J., dissenting) (private damage action is inconsistent with CEA's ceiling on penalties). When financial institutions raise service charges to compensate for this increased liability, the private damage remedy would

7. Nor do we agree with Hondo that the 1979 amendment to 12 U.S.C. § 371a permitting only commercial banks to offer automatic fund transfer accounts after December 31, 1979 evidences a legislative intent to confer a private right in favor of a commercial bank under § 1832. This amendment is of little value in determining whether the initial § 1832 or its later version creates a federal right in favor of commercial banks. *See Haynes v. United States,* 390 U.S. 85, 87 n. 4, 88 S.Ct. 722, 725 n. 4, 19 L.Ed.2d 923. In any event, "[t]he legislative history of the Depository Institutions Deregulation Act of 1980 offers no explanation for Congress's disparate treatment of granting federal reserve member banks ATS privileges one year earlier than all other federally insured depository institutions." *Otero Savings & Loan Assn. v. Federal Home Loan Bank Bd.,* 665 F.2d 279, 283 (10th Cir.1981).

penalize the institutions' customers. *See Otero Savings & Loan Association v. Federal Home Loan Bank Board,* 665 F.2d 279, 289 (10th Cir.1981). In sum, this enforcement scheme is an impediment to a conclusion that Congress intended to imply a private right of action.[8]

That the FHLBB did not invoke its enforcement power is of no moment. Implication of a private right of action is not the inevitable response to a supposed regulatory vacuum; certainly so when that perceived vacuum is only a decision by a regulatory body not to act. The FHLBB's refusal to enjoin a potential violation gives to this court no license to "engraft a remedy on a statute, no matter how salutory, that Congress did not intend to provide." *California v. Sierra Club,* 451 U.S. at 297, 101 S.Ct. at 1781.

We thus, as did the district court, decline to imply a private right of action under § 1832. The district court's dismissal of Hondo's claim against Gill was not in error.

### State Claims

Hondo also asserted a state claim of libel against Gill and sought an order directing Texas Savings & Loan Commissioner Alvis Vandygriff to enforce § 1832 against Gill pursuant to a Texas statute that empowers the state commissioner to order discontinuance of the violation of "any law." *See* Vernon's Ann.Civ.St. Art. 852a, § 8.13 (1982). The district court dismissed both claims, apparently treating them as pendent to the federal claim. The district court's order, however, gave no reason for its dismissal of the state statutory claim against Vandygriff but only granted "the motions to dismiss of Defendants." Despite the faint message, we are persuaded that the district court did not intend to reach the merits but dismissed on unspecified jurisdictional grounds. We find that the maintenance of the pendent claims in federal court depended on Hondo's federal

claim and we affirm the district court's decision to decline jurisdiction over them. As we said in *Capeletti,* "It is clear . . . that a district court has wide discretion to refuse to hear a pendent claim." 621 F.2d at 1317–18. Its discretion was properly exercised. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

AFFIRMED.

---

8. Although the fourth *Cort* factor—whether a federal remedy is within the federal domain of interest—favors Hondo, this factor becomes relevant only if the other factors give indication of a congressional intent to create a remedy. *See California v. Sierra Club,* 451 U.S. at 298, 101 S.Ct. at 1781; *Touche Ross & Co. v. Redington,* 442 U.S. at 575–76, 99 S.Ct. at 2488–89.