Mary WITHYCOMBE, Carmel Romano, Florence Della Valle, Walter Faulkner, Evelyn Solomon and Ralph Archangelo, on Behalf of themselves and all others similarly situated

v.

Samuel PIERCE, in his official capacity as Secretary of the United States Department of Housing & Urban Development, and Carabetta Management, Inc.

Civ. No. N–84–446 (PCD).

United States District Court, D. Connecticut.

May 14, 1985.

1178

Joanne Gibau, Elisabeth Youngerman, Jon Alander, New Haven, Conn., for plaintiffs.

Patricia Sharin Flagg, U.S. Dept. of HUD, Office of General Counsel, Washington, D.C., and Frank H. Santoro, Asst. U.S. Atty., New Haven, Conn., for Secretary Pierce.

Christine S. Vertefeuille, Susman & Duffy, New Haven, Conn., for Carabetta Management.

## RULING ON DEFENDANT PIERCE'S MOTION FOR SUMMARY JUDGMENT

DORSEY, District Judge.

Plaintiffs are a putative class of elderly tenants[1] at the Bella Vista I and II apartments in New Haven, Connecticut, whose federally-subsidized housing rents were converted in late 1982 and early 1983 from the Rent Supplement Program[2] to the Section 8 Program.[3] Alleging that their monthly rents were increased beyond the 10% limit (cap) mandated by the Housing & Urban-Rural Recovery Act of 1983 (1983

---

1. Mary Withycombe (Withycombe) is 71; Carmel Romano (Romano) is 66; Florence Della Valle (Della Valle) is 74; Walter Faulkner (Faulkner) is 71; Evelyn Solomon (Solomon) is 72; and Ralph Archangelo (Archangelo) is 72. Joint Stipulation of Facts at ¶¶ 1-6.

2. Authorized by § 101 of the Housing & Urban Development Act of 1965, 12 U.S.C. § 1701s.

3. United States Housing Act of 1937, 42 U.S.C. § 1437f.

Act),[4] plaintiffs seek injunctive and declaratory relief and return of overpaid rents. At issue is the validity of a regulation issued on May 10, 1984,[5] by defendant Samuel Pierce (Pierce), Secretary of the United States Department of Housing & Urban Development (HUD), interpreting the formula provided in § 206(d)(4)(B) of the 1983 Act for computing and applying the 10% cap to elderly tenants who had been converted prior to its enactment on November 30, 1983.

Plaintiffs allege (1) the regulation misconstrues the statute by applying the 10% cap to the pre-conversion rather than to the post-conversion rent (base figure claim); (2) by delaying implementation of the cap to the first "recertification"[6] on or after October 1, 1984, the regulation has deferred the cap's benefit for many tenants for at least one year (timing claim); and (3) contrary to Congress' intention, rent increases resulting from increases in income have been excluded from the cap (income increase claim). Plaintiffs claim under the 1983 Act and the Administrative Procedures Act (APA), 5 U.S.C. §§ 701, *et seq.*

In moving to dismiss for failure to state a claim upon which relief can be granted or, alternatively, for summary judgment, Pierce also argues that plaintiffs lack a private cause of action under either the 1983 Act or the Housing Act of 1937 (which contains Section 8) and have incorrectly asserted the appropriate standard of review under the APA. With the introduction of facts outside the pleadings,[7] Pierce's motion must be considered as one for summary judgment, Rule 12(b), Fed.R. Civ.P.; *Modern Woodcrafts, Inc. v. Hawley,* 534 F.Supp. 1000, 1002 n. 1 (D.Conn. 1982); 5 C. Wright & A. Miller, *Federal Practice and Procedure,* § 1366, at 679 (1969 Ed.), and for the reasons below, it is granted.

*Facts*

Plaintiffs' rents at the Bella Vista I and II projects, owned and operated by defendant Carabetta Management, Inc. (Carabetta), were first subsidized in the 1970's through the Rent Supplement Program. Under that program, a tenant's rent was the greater of 30% of the approved rent for the project (as defined by the Act) or 25% of the tenant's income.[8] The program did not require regular recertification of tenants' incomes. Initially, plaintiffs' rents were computed at 25% of their incomes, but, as approved rents rose, their rents came to be 30% of approved rents. As a result, plaintiffs' rents increased with increases in approved rents. Prior to their conversion to the Section 8 Program,[9] rent at Bella Vista I for plaintiffs Romano, Della Valle and Faulkner was $90 per month and at Bella Vista II for plaintiffs Withycombe, Solomon and Archangelo was $93.[10]

Under Section 8, rent is solely a percentage of income[11] which is recertified annual-

---

**4.** Public L. No. 98–181, 97 Stat. 1153, codified as notes to 12 U.S.C. §§ 1701, *et seq.*

**5.** 49 Fed.Reg. 19936, 19940–41 (May 10, 1984) (to be codified at 24 C.F.R. § 813.107(c)(6)).

**6.** Recertification means
that the tenant provides updated income information which is then verified for accuracy and completeness by the project owner or manager. Once allowable medical expenses are deducted, the 'recertified' income is used to calculate the share of rent which is paid by the tenant.
Joint Stipulation of Facts at §§ 11–12.

**7.** *See* Pierce's Memorandum at Exhibit 2, Declaration of James J. Tahash.

**8.** *See* 36 Fed.Reg. 24571, 24572–73 (December 22, 1971) (previously codified at 24 C.F.R. §§ 215.25(a) and 215.45(a)).

**9.** Della Valle, Faulkner and Romano were converted on September 1, 1982, and Withycombe, Solomon and Archangelo on May 1, 1983. Joint Stipulation of Facts at ¶¶ 11–12.

**10.** Bella Vista I's approved rent was then $301; Bella Vista II's was $309.

**11.** Rent is fixed at the greater of 10% of monthly income or 30% of adjusted monthly income. For those in occupancy prior to October 1, 1982, as were plaintiffs, the regulations specified the following lower, adjusted, monthly percentages:

ly. Since HUD authorized Carabetta to delay recertification of tenants' incomes until one year after conversion, which authorization is not challenged here, plaintiffs' rents for the first year after conversion were computed at 25% of their by-then outdated income levels.[12] Plaintiffs' first year, post-conversion rents were substantially lower than for the preceding year.

On October 1, 1983, and May 1, 1984, plaintiffs' incomes were recertified at higher levels. As a result thereof and of the use of a 28% rate (mandated for recertifications accomplished at these times [13]), plaintiffs' rents were increased over their pre-conversion rents and substantially over their first year's Section 8 rents. The incomes of Romano, Della Valle and Faulkner were recertified, prior to October 1, 1984, in their third year of conversion.

Plaintiffs' rent history is in Exhibit A.

*Discussion*

A. Cause of Action Claims

1. *Right of Action under 1983 Act or United States Housing Act*

██ "[W]hether a statute ... [authorizes] a cause of action, either expressly or by implication, is ... a matter of statutory construction." *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 15, 100 S.Ct. 242, 245, 62 L.Ed.2d 146 (1979). It is agreed that no explicit private action exists under either the 1983 Act or the United States Housing Act. Plaintiffs assert an implicit right.

The test for an implied right is said to be: First, is the plaintiff 'one of the class for whose *especial* benefit the statute was enacted,' .... Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? ... Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? ... And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the states, so that it would be inappropriate to infer a cause of action based solely on federal law?

*Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975) (emphasis in original; citation omitted). Satisfaction of the first test obviates satisfaction of the second. *Id.* at 82, 95 S.Ct. at 2089. Plaintiffs argue that as "especial" beneficiaries under the 1983 Act (which is not disputed), they need not satisfy the second test of *Cort*. In any case, legislative silence is construable as implying a private remedy. *Cannon v. University of Chicago*, 441 U.S. 677, 694, 99 S.Ct. 1946, 1956, 60 L.Ed.2d 560 (1979).

However, since *Cort*, whether such a right was *intended* has been held to be dispositive. *California v. Sierra Club*, 451 U.S. 287, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981); *Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979); *Transamerica Mortgage Advisors*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146; *Middlesex County Sewerage Auth. v. Sea Clammers*, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981); *Touche Ross & Co. v. Reddington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). "[I]mplying a private right of action on the basis of congressional silence is a hazardous enterprise, at best." *Touche Ross* at 571, 99 S.Ct. at 2486; *accord Sierra Club*, 451 U.S. at 295–96, 101 S.Ct. at 1780.

Congressional intent is first assessed from the statutory language, then the legislative history, and then any other traditional aids to statutory interpretation. *Middlesex*, 453 U.S. at 13, 101 S.Ct. at 2622.

Neither the statutory language nor the legislative history supports implication of

| Effective date of reexamination | Percentage |
|---|---|
| (insert Effective Date)—September 30, 1982 | 26 |
| October 1, 1982—September 30, 1983 | 27 |
| October 1, 1983—September 30, 1984 | 28 |
| October 1, 1984—September 30, 1985 | 29 |
| October 1, 1985 and after | 30 |

24 C.F.R. § 899.105(b).

**12.** The record does not clarify why this percentage was used.

**13.** *See* n. 11, *supra.*

such a right. The only code provision which addresses the question of suing or being sued is 42 U.S.C. § 1404a, which might be construed as reflecting an intent to allow a private action against HUD. A private cause of action has been held not to have been intended in various housing acts. *McGhee v. Housing Auth.*, 543 F.Supp. 607 (D.Ala.1982); *Falzarano v. United States*, 607 F.2d 506 (1st Cir.1979); *Perry v. Housing Auth.*, 664 F.2d 1210 (4th Cir.1981).

Absent a clear implication of congressional intent, the claim of a private cause of action must fail. Assuming, *arguendo*, plaintiffs' claim to a remedy under these Acts, their case must still fail as a matter of law for the reasons below.[14]

## 2. *Standard of Review*

"[O]nly upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967). Defendant does not dispute plaintiffs' cause of action,[15] but asserts that review is available under § 706(2)(C) only. Plaintiffs argue that this action is reviewable under either § 706(2)(A) or (C). Courts have tended not to distinguish between the two standards, but to apply both when reviewing the validity of an agency regulation. *Wilkinson v. Abrams*, 627 F.2d 650 (3rd Cir.1980); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Thus, the test under § 706(2)(C) is whether HUD acted within its statutory authority; and under § 706(2)(A) "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment ...." *Citizens to Preserve Overton Park* at 415–16, 91 S.Ct. at 823.

Great deference and weight must be accorded "to the interpretation given the statute by the officers or agency charged with its administration," *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1956), although "this deference is constrained by our obligation to honor the clear meaning of a statute, as revealed by its language, purpose, and history." *Southeastern Community College v. Davis*, 442 U.S. 397, 411, 99 S.Ct. 2361, 2369, 60 L.Ed.2d 980 (1979), quoting *International Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 566 n. 20, 99 S.Ct. 790, 800 n. 20, 58 L.Ed.2d 808 (1979); *accord Chevron U.S.A., Inc. v. Natural Resources Defense*, —— U.S. ——, 104 S.Ct. 2778, 2781–2782, 81 L.Ed.2d 694 (1984). To sustain defendant, "we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings." *Udall*, 380 U.S. at 16, 85 S.Ct. at 801, quoting *Unemployment Comm'r v. Aragon*, 329 U.S. 143, 153, 67 S.Ct. 245, 250, 91 L.Ed. 136 (1946).

Defendant's construction must be upheld under both standards.

## B. Substantive Claims

### 1. *Base Figure Claim*

Section 206(d)(4)(A) of the 1983 Act limits an increase of a tenant's rent upon conversion and in each succeeding year to 10%:

Notwithstanding any other provision of law, in the case of the conversion of any assistance under section 101 of the Housing and Urban Development Act of 1965 [the Rent Supplement Program] ... to assistance under section 8 of the United

---

**14.** Therefore, whether plaintiffs have satisfied the third and fourth factors of the *Cort* test need not be addressed.

**15.** Title 5, U.S.C., §§ 706(2)(A) and (C), APA, provide:

The reviewing court shall—

....

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
....
(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
....

States Housing Act of 1937, any increase in rent payments or contributions resulting from such conversion, and from the amendments made by this section of any tenant benefiting from such assistance who is sixty-two years of age or older may not exceed 10 per centum per annum.

Section 206(d)(4)(B) extended this limitation to tenants who, as here, had converted prior to its November 30, 1983 enactment:

> In the case of any such conversion of assistance occurring on or after October 1, 1981, and before the date of the enactment of this section, the rental payments due after such date of enactment by any tenant benefiting from such assistance who was sixty-two years of age or older on the date of such conversion shall be computed as if the tenant's rental payment or contribution had, on the *date of conversion*, been the lesser of the *actual rent payment* or contribution required, or 25 per centum of the tenant's income.

(Emphasis added).

At issue is to what base figure did Congress intend the cap to apply. Plaintiffs assert that the language unambiguously demonstrates the intention that the base figure be the tenant's "actual rent payment" after conversion (i.e. the initial Section 8 rent, noted in Column "C" of Exhibit A) and not the pre-conversion rent (i.e. the Rent Supplement Program amount, noted in Column "A" of Exhibit A) as specified in the regulation:

> Such recomputation shall be based on an assumption that the Family's contribution *immediately prior to conversion* was the lesser of (i) the actual contribution charged to the Family, or (ii) 25% of such Family's Annual Income After Allowances as determined as of the date of conversion, if no reexamination was conducted as of such date, as determined at the first reexamination thereafter.

49 Fed.Reg. 19936, 19940 (May 10, 1984) (emphasis added) (to be codified at 24 C.F.R. § 813.107(c)(6) ).

Under plaintiffs' interpretation, in the second year after conversion, their rents (Column "E", Exhibit A) increased beyond the 10% cap, while under defendant's interpretation only plaintiff Solomon's rent exceeded the cap.[16]

The statutory language is ambiguous as it does not clearly specify to what "actual rent payment" the formula is to be applied. This term could mean the tenant's "actual rent payment" immediately prior to conversion, on the date of conversion, or immediately subsequent to conversion. The verb in the sentence, "had been," suggests the payment intended was that immediately prior to conversion date, the sentence's reference point. The history and purpose of the Act may act "to determine whether defendant's interpretation is based on a permissible construction of the statute." *Chevron,* 104 S.Ct. at 2781–82.

The purpose of § 206(d)(4) was to protect tenants from large rent increases as a re-

---

16.

| Plaintiff | Increase in Section 8 rent for 2nd yr. over 1st yr. after conversion | Increase in Section 8 rent for 2nd yr. after conversion over Rent Supplement Program Rent (pre-conversion) |
|---|---|---|
| Withycombe | 70.0175 % | 2.2 % |
| Romano | 100.4166 % | 6.3 % |
| Della Valle | 141.935 % | (4.1)% |
| Faulkner | 102.222 % | 1.5 % |
| Solomon | 146.875 % | 34.9 %* |
| Archangelo | 155.00 % | 4.8 % |

\* Defendant's regulation does provide for rebates or credits for any rents paid by elderly tenants in excess of the 10% limit after November 30, 1983.

sult of conversion to the Section 8 Program.

For many senior citizen tenants, the conversion to the Sec. 8 Program and the *accompanying recertification of incomes* resulted in significant rent increases based on the cumulative affect of modest annual increases in Social Security benefits or pensions which had previously not been taken into consideration. The Committee has learned that many tenants in their 70's and 80's who have lived in their subsidized projects for over 10 years experienced sudden and substantial rent increases as a result of the conversion to Sec. 8 and the *accompanying recertification* of their incomes. These increases, particularly for senior citizens, were an unforeseen and unintentional consequence of the conversion and recertification process.... In the case of elderly tenants who were converted after October 1, 1981, but before the effective date of this Act [as the plaintiffs here], the Secretary shall increase their rents after the date of enactment of this Act as if the 10 percent annual limitation had been in effect since the time of conversion. The Committee does not intend that HUD provide any rebates in calculating the rents under this provision.

H.R.Rep. No. 98–123, 98th Cong., 1st Sess. 32 (1983) (emphasis added).

Thus, the legislative history suggests the contemplation that for most tenants conversion and recertification were a *simultaneous* process resulting in immediate and significant rent increases. To prevent such increases, the protection of the cap was extended to already converted tenants, noting no intent that "HUD provide any rebates." [17] Until made aware of HUD's delay in recertification, Congress could not have anticipated that conversion could result, as it did here, in substantial rent *decreases*. Such decreases, the result of HUD's delay in recertification, having occurred after the fact, could have no bearing on Congress' intent in its enactment of § 206(d)(4).

Defendant argues that the "cap" language of § 206(d)(4)(A) [18] buttresses its position since it unambiguously indicates the intent that the cap apply to pre-conversion rents.[19] Plaintiffs' theory would create the anomalous result of two different caps— for those converted after the 1983 Act, the cap would apply to their pre-conversion rent; but for those converted prior to the 1983 Act, the cap would apply to their post-conversion rents. Such a result could hardly have been intended. Plaintiffs' construction would lower some rents below pre-conversion levels, a windfall. Simultaneous conversion and income certification could result in a high base amount and a post-conversion rent substantially increased over the pre-conversion rent. That would not provide the protection intended by the cap. Such a construction as is, in the alternative, argued by plaintiffs, would potentially therefore work to the disadvantage of some tenants who would not be afforded the protection of the cap. This would be contrary to the clear legislative intent.

---

**17.** By its mention of "rebates," Congress could only have intended the cap to apply to the pre-conversion rent, since its application to a post-conversion rent based on a tenant's *recertified* income (as Congress assumed it, i.e. without a delay) would not result in a decrease in rent and, in turn, a rebate, but, on the contrary, could result in a 10% increase.

**18.** "[A]ny increase in rent ... resulting from ... conversion ... may not exceed 10 per centum per annum."

**19.** A prior version of § 206(d)(4)(B), § 210(*o*)(2), would also tend to support defendant's pre-conversion rent theory.

In the case of any such conversion of assistance occurring after October 1, 1981, and before the date of the enactment of the Housing and Urban-Rural Recovery Act of 1983, the rental payments due after such date by any tenant benefiting from such assistance who was 62 years of age or older on the date of such conversion shall be computed as if the limitation established in paragraph (1) [paragraph (1) contained a prior version of § 206(d)(4)(A)] had been in effect on such date of conversion.

Volume 129 Congressional Record No. 96, H5001, H5014 (July 12, 1983).

The regulations do not deny plaintiffs the protection Congress intended in § 206(d)(4). Rent increases may not exceed 10% per year over their pre-conversion rents, regardless how much their incomes have or will increase.

Defendant's construction of the Act is deemed reasonable and fully consistent with the purpose and intent of Congress in enacting § 206(d)(4). Plaintiffs' claim cannot be sustained.

### 2. Timing Claim

The regulation does not require immediate implementation of the cap as of the Act's November 30, 1983 enactment, but delays implementation to "the first regularly scheduled or interim re-examination ... conducted on or after October 1, 1984." 49 Fed.Reg. 11936, 19940 (May 10, 1984) (to be codified at 24 C.F.R. § 813.107(c)(6)). Absent an express implementation date, plaintiffs argue that the statute is self-executing, i.e. immediately so.

■ Defendant contends that there was no required date by which the cap must be implemented and the agency had explicit legal authority to delay implementation under § 206(d)(1)(A). Given the complexity of the statute, it is inconceivable that Congress could have intended that the cap be applied without defendant's involvement. Significant legal and practical considerations obstructed implementation[20] and thus justified the delay.

Neither the parties' nor the court's research has revealed any legislative history which elucidates Congress' intent on this issue. Reliance must, therefore, be primarily on the statutory language. The question "is whether the agency's answer is based on a permissible construction ... [of the scope of authority within] the statute." *Chevron* at 2782.

The following provisions of this paragraph apply to determinations of the rent to be paid by or the contribution required of a tenant occupying housing assisted under the authorities amended by this section ... on or before the effective date of regulations implementing this section:

(A) Notwithstanding any other provision of this section or subsections (a) through (h) of Section 322 of the Housing and Community Development Amendments of 1981, the Secretary ... may provide for delayed applicability, or for staged implementation, of the procedures for determining rents or contributions, as appropriate, required by such provisions if the Secretary determines that immediate application of such procedures would be impracticable, would violate the terms of the existing leases, or would result in extraordinary hardship for any class of tenants.

Section 206(d)(1)(A). Plaintiffs argue that this provision is limited to § 206(d)(1)(B)[21] and not to § 206(d)(4). Section 206(d)(4)(A) is noted to begin with the language "[n]otwithstanding any other provision of law," indicating Congress' intent to treat (d)(1) and (d)(4) independently.

Such a requirement cannot be reconciled with Congress' specific and repeated use of "this section" which can only refer to § 206 in its entirety, thus embracing § 206(d)(4).[22]

---

**20.** *See generally* Defendant's Memorandum at 28–29, n. 13, and Exhibit 2, Declaration of James J. Tahash, for examples of these legal and practical considerations.

**21.** Section 206(d)(1)(B) provides:
The Secretary shall provide that the rent or contribution, as appropriate, required to be paid by a tenant shall not increase as a result of the amendments made by this section and subsections (a) through (h) of Section 322 of the Housing and Community Development Amendments of 1981, and as a result of any other provision of Federal law or regulation,

by more than 10 per centum during any twelve-month period, unless the increase above 10 per centum is attributable to increases in income which are unrelated to such amendments, law, or regulation.

**22.** A prior version of § 206(d)(1)(A), § 303(e)(1)(A), tends to support defendant's construction:
Notwithstanding sections 302 and 303 of the Housing and Community Development Act of 1983 or subsections (a) through (h) of section 322 of the Housing and Community Development Amendments of 1981, the Secretary ...

If Congress wished to limit § 206(d)(1)(A), it could have used the narrower word "subsection" or by the explicit exemption of § 206(d)(4). Defendant distinguishes the two uses of "notwithstanding," which begins both § 206(d)(1)(A) and (4)(A), as articulating two different concepts—the first the timing of implementation and the second the basis for setting rent levels. Thus, Congress can be seen as intending, in § 206(d)(4)(A), *not* that the cap was exempt from the delay authorized in § 206(d)(1)(A), but rather that, regardless of how the law would otherwise set Section 8 rent levels, tenants converted to Section 8 would receive specific protection on a change of programs in the form of the 10% cap.

Plaintiffs argue that historically HUD has viewed certain statutes as effective without formal implementation, such as Section 322(a) of the Housing and Community Development Amendments of 1981 (the 1981 Act). Unlike the 1983 Act, Congress had not expressly authorized a delay in the applicability of the 1981 Act.

Limited as is the court's review, defendant's construction is reasonable and plaintiffs' timing claim cannot be sustained.

### 3. *Increase in Income Claim*

■ Plaintiffs' third contention[23] is that the regulations improperly exclude from the cap increases in converted tenants' income based on the following:

> The limitations contained in paragraphs (c)(2)(6) of this section do not apply to portions of increases in Total Tenant Payment which are attributable to increases in income or changes in Family composition or circumstances *unrelated to the factors referred to in (c)(2)–(6) of this section.*

49 Fed.Reg. 19936, 19441 (May 10, 1984), as amended by 49 Fed.Reg. 19941 (June 29, 1984) (emphasis added) (to be codified at 24 C.F.R. § 813.107(c)(8) ).

Defendant asserts that the underlined language requires that an increase in income related to one of the factors in the cited paragraphs (i.e. the cap which is described in paragraph 6), be within the cap. Defendant contends plaintiffs have misconstrued the regulation, since it "does not mean, nor is it intended to mean, that increases in income of elderly tenants converted to Section 8 are somehow exempt from the protection of the cap at issue here." Defendant's Memorandum at 30. Without dispute, the regulation effectuates the policy plaintiffs allege it should.

Deference to an agency's interpretation is even more clearly required "[w]hen the construction of an administrative regulation rather than a statute is in issue." *Udall,* 380 U.S. at 16, 85 S.Ct. at 801; *Bowles v. Seminole Rock Co.,* 325 U.S. 410, 413–14, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945). Plaintiffs' third claim must fail.

Accordingly, defendant's motion is granted and summary judgment shall enter dismissing the complaint.

SO ORDERED.

---

may provide for delayed applicability, or for stayed implementation, of the procedures for determining rents or contributions, as appropriate, required by such provisions if the Secretary determines that immediate application of such procedures would be impracticable, would violate the terms of existing leases, or would result in extraordinary hardship for any class of tenants.
Volume 129 Congressional Record No. 87, S8688, S8697 (June 20, 1983). Section 303 also contained a prior version of § 206(d)(4)(A)

thereby including it within the scope of HUD's authority to delay implementation.

**23.** Although plaintiffs raised this claim in their amended complaint and memorandum in support of preliminary injunction, they did not again refer to it in their memorandum in opposition to defendant's motion. Therefore, they may have withdrawn this challenge, as defendant notes.

(Joint Stipulation of Facts)

EXHIBIT A

RENT HISTORY OF PLAINTIFFS
IN CIVIL ACTION NO. N84–446

| PLAINTIFF | (A) LAST RENT SUPPLEMENT RENT (30% OF APPROVED RENT)* | (B) DATE OF CONVERSION TO $8 | (C) $8 RENT FOR FIRST YEAR AFTER CONVERSION (25% of originally certified income) | (D) (RECERTIFIED) ADJUSTED ANNUAL INCOME ONE YEAR AFTER CONVERSION** | (E) $8 RENT FOR SECOND YEAR AFTER CONVERSION (28% of Column D) | (F) (RECERTIFIED) ADJUSTED ANNUAL INCOME TWO YEARS AFTER CONVERSION** | (G) $8 RENT FOR THIRD YEAR AFTER CONVERSION (29% of COLUMN F) |
|---|---|---|---|---|---|---|---|
| Withycombe | $98 | 5/1/83 | $57 ($2,766— 8/78) | $4,163 | $ 97 | N/A | N/A |
| Romano | $90 | 9/1/82 | $48 ($2,329—12/75) | $4,318 | $101 | $4,442 | $107 |
| Della Valle | $90 | 9/1/82 | $81 ($1,499— 6/74) | $3,196 | $ 75 | $3,285 | $ 79 |
| Faulkner | $90 | 9/1/82 | $45 ($2,187— 6/74) | $3,892 | $ 91 | $3,887 | $ 94 |
| Solomon | $98 | 5/1/83 | $64 ($3,097— 6/74) | $6,769 | $158 | N/A | N/A |
| Archangelo | $98 | 5/1/83 | $40 ($1,910— 4/74) | $4,394 | $102 | N/A | N/A |

* For those plaintiffs residing at Bella Vista I—$301; for those residing at Bella Vista II—$309.

** After medical allowances.