CALIFORNIA ET AL. *v.* SIERRA CLUB ET AL.

No. 79–1252.   Argued January 21, 1981—Decided April 28, 1981*

---

*Together with No. 79–1502, *Kern County Water Agency et al.* v. *Sierra Club et al.,* also on certiorari to the same court.

WHITE, J., delivered the opinion of the Court, in which BRENNAN, MARSHALL, BLACKMUN, and STEVENS, JJ., joined. STEVENS, J., filed a concurring opinion, *post,* p. 298. REHNQUIST, J., filed an opinion concurring in the judgment, in which BURGER, C. J., and STEWART and POWELL, JJ., joined, *post,* p. 301.

*Roderick Walston,* Deputy Attorney General of California, argued the cause for petitioners in both cases. With him on the briefs for petitioners in No. 79–1252 were *George Deukmejian,* Attorney General, *R. H. Connett,* Assistant Attorney General, and *Gregory K. Wilkinson,* Deputy Attorney General. *Warren J. Abbott, Victor E. Gleason, Albert T. Henley, Daniel F. Gallery,* and *Clifford W. Schulz* filed briefs for petitioners in No. 79–1502.

*Elinor Hadley Stillman* argued the cause in both cases for the federal parties, respondents under this Court's Rule 19.6. With her on the briefs were *Solicitor General McCree, Acting Assistant Attorney General Macbeth, Deputy Solicitor General Claiborne, Jacques B. Gelin,* and *Robert L. Klarquist.*

*John B. Clark* argued the cause for respondents Sierra Club et al. in both cases. With him on the brief were *James E. Harrington, Robert B. Thum,* and *Michael R. Sherwood.*†

†A brief for the State of Arizona et al. as *amici curiae* urging reversal was filed by *Ralph E. Hunsaker* and by the Attorneys General and other officials of their respective States as follows: *J. D. MacFarlane,* Attorney General of Colorado, and *Richard Hennessey,* Deputy Attorney General; *David H. Leroy,* Attorney General of Idaho; *Robert T. Stephan,* Attorney General of Kansas and *Bruce E. Miller; Mike Greely,* Attorney General of Montana; *Paul L. Douglas,* Attorney General of Nebraska, and *Judy K. Hoffman,* Assistant Attorney General; *Richard H. Bryan,* Attorney General of Nevada; *Jeff Bingaman,* Attorney General of New Mexico, and *Richard A. Simms,* Special Assistant Attorney General; *Allen I. Olson,* Attorney General of North Dakota, and *Murray Sagsveen,* Assistant Attor-

JUSTICE WHITE delivered the opinion of the Court.

Under review here is a decision of the Court of Appeals for the Ninth Circuit holding that private parties may sue under the Rivers and Harbors Appropriation Act of 1899 to enforce § 10 of that Act. An environmental organization and two private citizens (hereafter respondents) [1] seek to enjoin the construction and operation of water diversion facilities which are part of the California Water Project (CWP). They rely upon § 10 of the Act, which prohibits "[t]he creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States . . . ." [2] Since the Act does not explicitly create a pri-

ney General; *Jan Eric Cartwright,* Attorney General of Oklahoma; *James A. Redden,* Attorney General of Oregon, and *Peter S. Herman; Mark V. Meierhenry,* Attorney General of South Dakota, and *Lawrence Kyte,* Assistant Attorney General; *Mark White,* Attorney General of Texas, and *Douglas G. Caroom,* Assistant Attorney General; *Robert B. Hansen,* Attorney General of Utah; *Slade Gorton,* Attorney General of Washington, and *Charles B. Roe, Jr.,* Senior Assistant Attorney General; and *John D. Troughton,* Attorney General of Wyoming, and *Jack D. Palma II,* Senior Assistant Attorney General.

Briefs of *amici curiae* urging affirmance were filed by *James A. Hourihan, Harold E. Masback III,* and *Kenneth S. Kamlet* for the National Wildlife Federation et al., and by *John B. Clausen, Cressey H. Nakagawa, Gerald A. Sherwin, Richard W. Dickenson, Dante John Nomellini,* and *John A. Wilson* for the Public Water Agencies.

[1] The Sierra Club is a nonprofit California corporation; Hank Schramm is a commercial fisherman active in the San Francisco Bay and Pacific Ocean; and William Dixon is a Sacramento-San Joaquin Delta landowner. See 400 F. Supp. 610, 619 (ND Cal. 1975).

[2] Section 10 of the Rivers and Harbors Appropriation Act of 1899 provides:

"The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans

vate enforcement mechanism, the initial question presented by these consolidated cases is whether such a private right of action can be implied on behalf of those allegedly injured by a claimed violation of § 10. Petitioner State of California also asks us to decide whether the Act requires permits for the state water allocation projects involved in these cases.

## I

The California Water Project consists of a series of water storage and transportation facilities designed primarily to transport water from the relatively moist climate of northern California to the more arid central and southern portions of the State. The water which will be used by the CWP is initially stored behind dams on the Sacramento River and, as needed, released into the Sacramento-San Joaquin Delta. The CWP then diverts a quantity of this water from the Delta and directs it into canals and aqueducts which will carry it south. The project has both federal and state components. The federal component, the Central Valley Project, is designed in part to provide a constant source of water for irrigation to the Central Valley of California. Water for this project is diverted from the Delta by the Tracy Pumping Plant into the 115-mile Delta-Mendota Canal which transports the water to the Mendota Pool in California's Central Valley. The State Water Project supplies water to both central and southern California by way of the California Aqueduct. Water for this project is drawn from the Delta by the Delta Pumping Plant and deposited in the

---

recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor or refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same." 30 Stat. 1151, 33 U. S. C. § 403.

northern terminus of the California Aqueduct, through which it flows to its destinations in central and southern California.

Under the present system the quality of water captured in the north and released into the Delta may be degraded by intruding salt waters from the Pacific Ocean. As a consequence the water which is diverted from the Delta to the Delta-Mendota Canal or the California Aqueduct is potentially of a lesser quality than is the water which is transported to the Delta from storage facilities in the north and from there deposited in the Delta. The State of California has proposed the construction of a 42-mile Peripheral Canal along the eastern edge of the Delta area, which would avoid any mixing of the water from the north with the saline water of the Delta. Instead of depositing water in the Delta, the canal would carry high quality water directly to the Tracy and Delta Pumping Plants.

Respondents commenced the present action in 1971 in the United States District Court for the Northern District of California. *Sierra Club* v. *Morton,* 400 F. Supp. 610 (1975). Named as defendants were the various federal and state officials who administer the agencies responsible for overseeing the operation, construction, and regulation of the CWP facilities in question.[3] Petitioner water agencies, which had contracted with the State for water from the Delta and which had incurred extensive financial obligations in reliance thereon, were permitted to intervene.[4] The respondents alleged that present

---

[3] The federal defendants were the Secretary of the Interior, the Commissioner of the Bureau of Reclamation, the Secretary of the Army, the Chief of Engineers of the Army Corps of Engineers, and the Division Engineer of the Corps' South Pacific Division. The state defendants were the Secretary for Resources and the Director of the Department of Water Resources. 400 F. Supp., at 620.

[4] According to affidavits filed in 1974 in support of motions to intervene, Kern County Water Agency has contracted to purchase up to 1,153,000 acre-feet annually, which is resold primarily to agricultural

and proposed diversions of water from the Delta degraded the quality of Delta water, and that such diversion violated § 10 of the Rivers and Harbors Appropriation Act of 1899. They sought to enjoin further operation or construction of water diversion facilities until the consent of the Army Corps of Engineers was obtained as required by the Act.

The District Court concluded that respondents could avail themselves of a "private cause of action" to enforce § 10 of the Act, and ruled on the merits that approval of the Corps of Engineers was required by § 10 for the Tracy and Delta Pumping Plants and the Peripheral Canal. *Sierra Club* v. *Morton, supra.* The Court of Appeals for the Ninth Circuit agreed that a private cause of action to enforce the Act existed. *Sierra Club* v. *Andrus,* 610 F. 2d 581 (1979). It reversed the District Court as to the Tracy Pumping Plant, however, ruling that Congress has consented to its construction and operation.[5] We granted petitions for certiorari filed by the water agencies and the State of California. 449 U. S. 818 (1980).

## II

*Cort* v. *Ash,* 422 U. S. 66 (1975), outlined a "preferred approach for determining whether a private right of action should be implied from a federal statute . . . ." *Transamerica Mortgage Advisors, Inc.* v. *Lewis,* 444 U. S. 11, 26 (1979) (WHITE, J., dissenting); see *Cannon* v. *University of Chicago,*

---

users. The Metropolitan Water District of Southern California has contracted to purchase up to 2,011,500 acre-feet annually to serve the water needs of an area of some 4,900 square miles with 10 million inhabitants. The Tulare Lake Basin Water Storage District and the Santa Clara Valley Water District have contracted to purchase lesser amounts. See App. 99a–112a.

[5] Judge Tang wrote separately to explain why the conclusion that the Tracy Pumping Plant had been authorized by Congress did not conflict with the Ninth Circuit's recent decision in *Libby Rod & Gun Club* v. *Poteat,* 594 F. 2d 742 (1979). 610 F. 2d, at 607.

441 U. S. 677 (1979). This approach listed four factors thought to be relevant to the inquiry:

"First, is the plaintiff 'one of the class for whose *especial* benefit the statute was enacted,' . . . —that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? . . . Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? . . . And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?" 422 U. S., at 78.

Combined, these four factors present the relevant inquiries to pursue in answering the recurring question of implied causes of action. Cases subsequent to *Cort* have explained that the ultimate issue is whether Congress intended to create a private right of action, see *Universities Research Assn., Inc. v. Coutu,* 450 U. S. 754, 771–772 (1981); *Transamerica Mortgage Advisors, Inc. v. Lewis, supra,* at 23–24; *Touche Ross & Co. v. Redington,* 442 U. S. 560, 568, 575–576 (1979); but the four factors specified in *Cort* remain the "criteria through which this intent could be discerned." *Davis v. Passman,* 442 U. S. 228, 241 (1979); *Transamerica Mortgage Advisors, Inc. v. Lewis, supra,* at 27 (WHITE, J., dissenting).

Under *Cort,* the initial consideration is whether the plaintiff is a member of a class for " 'whose *especial* benefit the statute was enacted.' " *Cort v. Ash, supra,* at 78, 80–82; see *Touche Ross & Co. v. Redington, supra,* at 569–570; *Cannon v. University of Chicago, supra,* at 689–694. Without analyzing either the language or legislative history of the Act, the Court of Appeals here concluded that the Act was designed for the especial benefit of private parties who may suffer "special injury" caused by an unauthorized obstruc-

tion to a navigable waterway. It was apparently reasoned that since Congress enacted a statute that forbids such obstructions in navigable waters, any person who would be "especially harmed" by an unauthorized obstruction was an especial beneficiary of the Act. But such a definition of "especial" beneficiary makes this factor meaningless. Under this view, a victim of any crime would be deemed an especial beneficiary of the criminal statute's proscription. *Cort* did not adopt such a broad-gauge approach. *Cort* v. *Ash, supra,* at 80–82. The question is not simply who would benefit from the Act, but whether Congress intended to confer federal rights upon those beneficiaries. See *Cannon, supra,* at 690–693, n. 13.

In ascertaining this intent, the first consideration is the language of the Act. Here, the statute states no more than a general proscription of certain activities; it does not unmistakably focus on any particular class of beneficiaries whose welfare Congress intended to further. Such language does not indicate an intent to provide for private rights of action. "There would be far less reason to infer a private remedy in favor of individual persons if Congress, instead of drafting Title IX [of the Education Amendments of 1972] with an unmistakable focus on the benefited class, had written it simply as a ban on discriminatory conduct by recipients of federal funds or as a prohibition against the disbursement of public funds to educational institutions engaged in discriminatory practices." *Cannon* v. *University of Chicago, supra,* at 690–693; see also *Touche Ross & Co.* v. *Redington, supra,* at 569; *Cort* v. *Ash, supra,* at 80–82. Section 10 of the Rivers and Harbors Appropriation Act is the kind of general ban which carries with it no implication of an intent to confer rights on a particular class of persons.

Neither the Court of Appeals nor respondents have identified anything in the legislative history suggesting that § 10 was created for the especial benefit of a particular class. On the contrary, the legislative history supports the view that

the Act was designed to benefit the public at large by empowering the Federal Government to exercise its authority over interstate commerce with respect to obstructions on navigable rivers caused by bridges and similar structures. In part, the Act was passed in response to this Court's decision in *Willamette Iron Bridge Co.* v. *Hatch,* 125 U. S. 1 (1888). There the Court held that there was no federal common law "which prohibits obstructions and nuisances in navigable rivers." *Id.,* at 8. Although *Willamette* involved private parties, the clear implication of the Court's opinion was that in the absence of specific legislation no party, including the Federal Government, would be empowered to take any action under federal law with respect to such obstructions. The Act was intended to enable the Secretary of War to take such action.[6] See 21 Cong. Rec. 8603, 8605, and 8607 (1890); see also *United States* v. *Pennsylvania Industrial Chemical Corp.,* 411 U. S. 655, 663–664 (1973); *United States* v. *Standard Oil Co.,* 384 U. S. 224, 227–229 (1966); *United States* v. *Republic Steel Corp.,* 362 U. S. 482, 485–488, 499–500 (1960). Congress was not concerned with the rights of individuals.

It is not surprising, therefore, that there is no "indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one." *Cort* v. *Ash,* 422 U. S., at 78, 82–

---

[6] In addition, § 12 of the Act, 33 U. S. C. § 406, provides criminal penalties for violations of the provisions of various sections of the Act, including the provisions of § 10; and, § 17 of the Act, 33 U. S. C. § 413, provides that "[t]he Department of Justice shall conduct the legal proceedings necessary to enforce the provisions of [§ 10]." The creation of one explicit mode of enforcement is not dispositive of congressional intent with respect to other complementary remedies. See *Cort* v. *Ash,* 422 U. S. 66, 82–83, n. 14 (1975); *Transamerica Mortgage Advisors, Inc.* v. *Lewis,* 444 U. S. 11, 29, n. 6 (1979) (WHITE, J., dissenting). However, here, considering the clear focus of the legislative history on the need to enable the Government to respond to obstructions in navigable waterways, the creation of this enforcement mechanism and the absence of the remedy sought by respondents, certainly reinforces the view that Congress was not concerned with private rights or remedies in designing this legislation.

84; *Touche Ross & Co.* v. *Redington,* 442 U. S., at 571; *Cannon* v. *University of Chicago,* 441 U. S., at 694–703. The Court of Appeals recognized as much: "The legislative history of the Rivers and Harbors Act of 1899 does not reflect a congressional intent either to afford a private remedy or to deny one." 610 F. 2d, at 588. This silence on the remedy question serves to confirm that in enacting the Act, Congress was concerned not with private rights but with the Federal Government's ability to respond to obstructions on navigable waterways.[7]

---

[7] Respondents suggest that the legislative history of the Act must be read in light of the historical context during which the measure was being considered. See *Cannon* v. *University of Chicago,* 441 U. S. 677, 698–699 (1979). That context, they argue, included a general awareness that the obstruction of any navigable stream could have been addressed through the common law of nuisance and that this private remedy had been recognized at one time as federal in nature. Furthermore, they argue that the contemporary legal climate recognized that the abrogation of this federal remedy in cases such as *Willamette Iron Bridge Co.* v. *Hatch,* 125 U. S. 1 (1888), did not undermine the accepted view that the enactment of any federal prohibition of obstructions on navigable streams would resurrect the federal private right of action. Congressional silence as to private remedies should be interpreted, therefore, as acquiescing in the accepted view.

For both of these positions respondents rely heavily upon *Pennsylvania* v. *Wheeling & Belmont Bridge Co.,* 13 How. 518 (1852). There, the State of Pennsylvania sought equitable relief from the construction of a bridge across the Ohio River. The Court took the case under its original jurisdiction, a State being the plaintiff, and, having done so, held that it was empowered to consider all issues presented by the parties, state as well as federal. Respondents suggest that the *Wheeling* Court held that federal courts were regularly available to entertain actions for nuisance brought by private parties with respect to obstructions on navigable rivers. But nothing in the opinion supports that view. The discussion in that case of the common law of nuisance is based on the Court's position that it was entitled to consider state as well as federal issues in the cause before it. Indeed, that the opinion did not establish a general federal law of nuisance with respect to navigable waterways was a point reiterated in *Willamette, supra,* at 15–17. In short, although

As recently emphasized, the focus of the inquiry is on whether Congress intended to create a remedy. *Universities Research Assn., Inc.* v. *Coutu,* 450 U. S., at 771–772; *Transamerica Mortgage Advisors, Inc.* v. *Lewis,* 444 U. S., at 23–24; *Touche Ross & Co.* v. *Redington, supra,* at 575–576. The federal judiciary will not engraft a remedy on a statute, no matter how salutary, that Congress did not intend to provide. Here consideration of the first two *Cort* factors is dispositive. The language of the statute and its legislative history do not suggest that the Act was intended to create federal rights for the

there may have been a common-law nuisance cause of action for obstructions of navigable waterways, *Wheeling Bridge* did not federalize that law. Respondents have cited no decision by this Court that did.

Equally unavailing is respondents' assertion that *Wheeling Bridge* stands for the broad proposition that if Congress legislated in this area, any prohibition of obstructions would automatically support a private right of action. This position is extrapolated from discussions of the law of nuisance in both *Wheeling Bridge, supra,* at 604–607 and the subsequent *Gilman* v. *Philadelphia,* 3 Wall. 713, 722–724 (1866). In both cases the Court merely expressed agreement with the proposition that a court of equity could enjoin a public nuisance in a case brought by a private person who had sustained specific injury. Whether a congressional enactment prohibiting obstructions would automatically give rise to a private right of action was not an issue raised or discussed in either case.

The most that may be legitimately concluded as to legislative understanding of the law preceding the enactment of this statute is that Congress was aware that the Supreme Court had held that there was no federal law which empowered anyone to contest obstructions to navigable rivers. See 21 Cong. Rec. 8604–8607 (1890). We cannot assume from legislative silence on private rights of action, that Congress anticipated that a general regulatory prohibition of obstructions to navigable streams would provide an automatic basis for a private remedy in the nature of common-law nuisance. The Rivers and Harbors Appropriation Act of 1899 was no doubt in part a legislative response to the *Willamette* decision. But there is nothing to suggest that that response was intended to do anything more than empower the Federal Government to respond to obstructions on navigable rivers. The broad view supported by respondents is without support.

especial benefit of a class of persons but rather that it was intended to benefit the public at large through a general regulatory scheme to be administered by the then Secretary of War. Nor is there any evidence that Congress anticipated that there would be a private remedy. This being the case, it is unnecessary to inquire further to determine whether the purpose of the statute would be advanced by the judicial implication of a private action or whether such a remedy is within the federal domain of interest. These factors are only of relevance if the first two factors give indication of congressional intent to create the remedy. *Touche Ross & Co.* v. *Redington, supra,* at 574–576. There being no such indication, the judgment of the Court of Appeals must be reversed.

## III

Petitioner the State of California urges that we reach the merits of these cases—whether permits are required for the state water allocation projects—regardless of our disposition of the private-cause-of-action issue. This we decline to do. Our ruling that there is no private cause of action permitting respondents to commence this action disposes of the cases: we cannot consider the merits of a claim which Congress has not authorized respondents to raise.

The judgment of the Court of Appeals is accordingly reversed, and the cases are remanded for proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, concurring.

In 1888 this Court reversed a decree enjoining the construction of a bridge over a navigable river. *Willamette Iron Bridge Co.* v. *Hatch,* 125 U. S. 1. The Court's opinion in that case did not question the right of the private parties to seek relief in a federal court; rather, the Court held that no federal rule of law prohibited the obstruction of the navigable water-

way.[1]  Congress responded to the *Willamette* case in the
Rivers and Harbors Act of 1890 by creating a federal prohibi-
tion of such obstructions absent a permit from the Secretary
of War.  26 Stat. 426, 454.  At the time the statute was
enacted, I believe the lawyers in Congress simply assumed
that private parties in a position comparable to that of the
litigants in the *Willamette* case would have a remedy for any
injury suffered by reason of a violation of the new federal
statute.[2]  For at that time the implication of private causes

---

[1] The *Willamette* Court explained the issue presented as follows:

"The gravamen of the bill was, the obstruction of the navigation of the
Willamette River by the defendants, by the erection of the bridge which
they were engaged in building.  The defendants pleaded the authority of
the state legislature for the erection of the bridge.  The court held that
the work was not done in conformity with the requirements of the state
law; but whether it were or not, it lacked the assent of Congress, which
assent the court held was necessary in view of that provision in the act
of Congress admitting Oregon as a State, which has been referred to.
The court held that this provision of the act was tantamount to a dec-
laration that the navigation of the Willamette River should not be ob-
structed or interfered with; and that any such obstruction or interfer-
ence, without the consent of Congress, whether by state sanction or not,
was a violation of the act of Congress; and that the obstruction com-
plained of was in violation of said act.  And this is the principal and
important question in this case, namely, whether the erection of a bridge
over the Willamette River at Portland was a violation of said act of
Congress.  If it was not, if it could not be, if the act did not apply to
obstructions of this kind, then the case did not arise under the constitu-
tion or laws of the United States, unless under some other law referred
to in the bill."  125 U. S., at 7–8.

[2] The then-current edition of Cooley's treatise on the Law of Torts
790 (2d ed. 1888) described the common-law remedy for breach of a statu-
tory duty in this way:

"[W]hen the duty imposed by statute is manifestly intended for the
protection and benefit of individuals, the common law, when an individ-
ual is injured by a breach of the duty, will supply a remedy, if the statute
gives none."

A few years earlier this Court quoted with approval an opinion by
Judge Cooley in support of its holding that a railroad's breach of a stat-

of action was a well-known practice at common law and in American courts.[3] Therefore, in my view, the Members of Congress merely assumed that the federal courts would follow the ancient maxim *"ubi jus, ibi remedium"* and imply a private right of action. See *Texas & Pacific R. Co.* v. *Rigsby,* 241 U. S. 33, 39–40.[4] Accordingly, if I were writing on a clean slate, I would hold that an implied remedy is available to respondents under this statute.

---

utory duty to fence its right-of-way gave an injured party an implied damages remedy. See *Hayes* v. *Michigan Central R. Co.,* 111 U. S. 228, 240.

[3] See *Anonymous,* 6 Mod. 27, 87 Eng. Rep. 791 (1703) (per Holt, C. J.); 2 E. Coke, Institutes on the Laws of England 55 (6th ed. 1681); 3 W. Blackstone, Commentaries *23, *51, *109, *123; 1 Comyns' Digest 433–445 (1822); *Couch* v. *Steel,* 3 El. & Bl. 402, 118 Eng. Rep. 1193 (1854). In Comyns' Digest, at 442, the rule was broadly stated:

"So, in every case, where a statute enacts, or prohibits a thing for the benefit of a person, he shall have a remedy upon the same statute for the thing enacted for his advantage, or for the recompence of a wrong done to him contrary to the said law."

[4] As Justice Frankfurter stated in dissent in *Montana-Dakota Utilities Co.* v. *Northwestern Public Service Co.,* 341 U. S. 246, 261–262:

"Courts, unlike administrative agencies, are organs with historic antecedents which bring with them well-defined powers. They do not require explicit statutory authorization for familiar remedies to enforce statutory obligations. *Texas & N. O. R. Co.* v. *Brotherhood of Clerks,* 281 U. S. 548; *Virginian R. Co.* v. *System Federation,* 300 U. S. 515; *Deckert* v. *Independence Shares Corp.,* 311 U. S. 282. A duty declared by Congress does not evaporate for want of a formulated sanction. When Congress has 'left the matter at large for judicial determination,' our function is to decide what remedies are appropriate in the light of the statutory language and purpose and of the traditional modes by which courts compel performance of legal obligations. See *Board of Comm'rs* v. *United States,* 308 U. S. 343, 351. If civil liability is appropriate to effectuate the purposes of a statute, courts are not denied this traditional remedy because it is not specifically authorized. *Texas & Pac. R. Co.* v. *Rigsby,* 241 U. S. 33; *Steele* v. *Louisville & N. R. Co.,* 323 U. S. 192; *Tunstall* v. *Brotherhood of Locomotive Firemen & Enginemen,* 323 U. S. 210; cf. *De Lima* v. *Bidwell,* 182 U. S. 1."

The slate, however, is not clean. Because the problem of ascertaining legislative intent that is not expressed in legislation is often so difficult, the Court has wisely developed rules to guide judges in deciding whether a federal remedy is implicitly a part of a federal statute. In *Cort* v. *Ash,* 422 U. S. 66, all of my present colleagues subscribed to a unanimous formulation of those rules, and in *Cannon* v. *University of Chicago,* 441 U. S. 677, a majority of the Court joined my attempt to explain the application of those rules in that case. The *Cort* v. *Ash* analysis is therefore a part of our law.[5]

In these cases, I believe the Court correctly concludes that application of the *Cort* v. *Ash* analysis indicates that no private cause of action is available. I think it is more important to adhere to the analytical approach the Court has adopted than to base my vote on my own opinion about what Congress probably assumed in 1890. Cf. *Florida Dept. of Health & Rehabilitative Services* v. *Florida Nursing Home Assn.,* 450 U. S. 147, 151 (STEVENS, J., concurring). I therefore join JUSTICE WHITE's opinion for the Court.

JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE, JUSTICE STEWART, and JUSTICE POWELL join, concurring in the judgment.

I agree completely with the conclusion of the Court that in these cases "Congress was not concerned with the rights of individuals" and that "[i]t is not surprising, therefore, that there is no 'indication of legislative intent, explicit or implicit, either to create . . . a [private] remedy or to deny one.'" *Ante,* at 295.

---

[5] In a separate concurrence in this case, four Members of the Court have undertaken to explain the legal effect of certain "implied right of action" opinions decided more recently than *Cort* v. *Ash.* As THE CHIEF JUSTICE, JUSTICE STEWART, JUSTICE REHNQUIST, and I noted in our separate opinion in *University of California Regents* v. *Bakke,* 438 U. S. 265, 408, n. 1, "it is hardly necessary to state that only a majority can speak for the Court" or give an authoritative explanation of the meaning of its judgments.

I also agree with the Court's analysis, *ante,* at 297, where it says:

"As recently emphasized, the focus of the inquiry is on whether Congress intended to create a remedy. *Universities Research Assn., Inc.* v. *Coutu,* 450 U. S., at 771–772; *Transamerica Mortgage Advisors, Inc.* v. *Lewis,* 444 U. S., at 23–24; *Touche Ross & Co.* v. *Redington,* [442 U. S.], at 575–576. The federal judiciary will not engraft a remedy on a statute, no matter how salutary, that Congress did not intend to provide."

My only difference, and the difference which leads me to write this separate concurrence in the judgment, is that I think the Court's opinion places somewhat more emphasis on *Cort* v. *Ash,* 422 U. S. 66 (1975), than is warranted in light of several more recent "implied right of action" decisions which limit it. These decisions make clear that the so-called *Cort* factors are merely guides in the central task of ascertaining legislative intent, see *Transamerica Mortgage Advisors, Inc.* v. *Lewis,* 444 U. S. 11, 15 (1979); *Touche Ross & Co.* v. *Redington,* 442 U. S. 560, 575–576 (1979); *Cannon* v. *University of Chicago,* 441 U. S. 677, 739–740 (1979) (POWELL, J., dissenting), that they are not of equal weight, *Transamerica, supra,* at 15, 23–24; *Touche Ross, supra,* at 575–576; and that in deciding an implied-right-of-action case courts need not mechanically trudge through all four of the factors when the dispositive question of legislative intent has been resolved, *Transamerica, supra,* at 24; *Touche Ross, supra,* at 575–576; *Kissinger* v. *Reporters Committee for Freedom of the Press,* 445 U. S. 136, 148–149 (1980). Surely it cannot be seriously argued that a mechanical application of the *Cort* analysis lends "predictability" to implied-right-of-action jurisprudence: including today's decision, five of the last six statutory implied-right-of-action cases in which we have reviewed analysis by the Courts of Appeals after *Cort* have resulted in reversal of erroneous Court of Appeals deci-

sions. See *Universities Research Assn., Inc.* v. *Coutu,* 450 U. S. 754 (1981); *Transamerica, supra; Touche Ross, supra; Cannon, supra.* Cf. *Northwest Airlines, Inc.* v. *Transport Workers, ante,* p. 77. While this may be predictability of a sort, it is not the sort which the Court in *Cort* v. *Ash, supra,* or in any other case seeking to afford guidance to statutory construction intended.

But in these cases, I am happy to agree with the Court that there is no implied right of action because "[t]he language of the statute and its legislative history do not suggest that the Act was intended to create federal rights for the especial benefit of a class of persons," *ante,* at 297–298, and because there is no "evidence that Congress anticipated that there would be a private remedy." *Ante,* at 298.