**BUCHANAN MARINE, INC., Plaintiff,**

v.

**McCORMACK SAND COMPANY, Defendant.**

**No. 87 C 2701.**

United States District Court, E.D. New York.

Oct. 2, 1987.

Cadwalader, Wickersham & Taft, New York City (Steven Lenkowsky, Theodore A. Ulrich, William S. Busch, and Robert M. Horkovich, of counsel), for plaintiff.

Pinks, Brooks, Stern & Arbeit, Hauppauge, N.Y. (Marshall M. Stern, of counsel), for defendant.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

Plaintiff, Buchanan Marine, Inc. (Buchanan), a Delaware corporation with its principal place of business in Connecticut, brought this action against defendant, McCormack Sand Company (McCormack), a joint venture of two corporations located in New York. The complaint asserts diversity and maritime jurisdiction. Buchanan alleges that McCormack has improperly used and interfered with Buchanan's use of its mooring buoy in Stamford Harbor, Connecticut. The complaint includes claims for declaratory and injunctive relief and for damages. Buchanan moves now for a preliminary injunction to restrain McCormack from using the mooring.

### I.

The facts, as revealed by the parties' affidavits, are as follows. Buchanan owns and operates tug boats and barges for the delivery of stone and other bulk material in, among other places, Connecticut. McCormack delivers sand by barge in Connecticut. Both parties have customers in Stamford Harbor. To make deliveries to these customers, both parties moor their barges inside the harbor. Mooring outside the harbor would cause a hazard to navigation on Long Island Sound and to any barge so moored and thus is not feasible.

The Managing Director of Buchanan claims that he first installed a commercial barge mooring in Stamford Harbor in July 1972, with the permission of the harbor master. See Affidavit of Edward T. Buchanan, Jr. (Buchanan Aff.) at 1. Between 1972 and 1981 another company owned and maintained the mooring under a permit issued by the harbor master. Buchanan says it attained ownership of the mooring in 1981. See id. at 2. In October of that year it obtained a permit from the present harbor master, John Sheridan, to maintain the mooring buoy. The permit application designated the approximate position in which the buoy was to be placed. Sheridan's letter accompanying the permit advised that the holder of the permit is "responsible for maintaining the position of th[e] buoy and will be expected to reset it if it should get out of position." Id., Exhibit (Ex.) B. According to Buchanan's Chief of Maintenance, although Buchanan never specifically authorized McCormack to use the mooring, it tolerated occasional use by McCormack until 1983. See Affidavit of Allen H. Birk (Birk Aff.) at 2.

Between October 1981 and June 1982 the mooring sometimes moved out of position. Apparently, at least once McCormack dispatched a barge to place the mooring back in its proper location. On June 17, 1982 Sheridan wrote to Buchanan that its mooring had been moved off station; Buchanan responded on June 23, 1982 that it had repositioned the mooring and had requested immediate notification from all towing companies should the mooring be moved off station again. See id., Ex. D.

On July 27, 1982 Buchanan sent certified letters to other companies towing barges in

the area informing them that they would be charged "$1,000.00 for any unauthorized tie-ups at any of our moorings, plus an additional charge of $1,000.00 per day." *Id.*, Ex. E. At some point after this notification, McCormack asked Sheridan if it could obtain its own mooring permit. Sheridan replied that only one permit would be issued for commercial anchorage inside Stamford harbor. Affidavit of Raymond Peterson, at 3.

On October 9, 1982 Sheridan again wrote to Buchanan that its mooring had been moved off station, stating that

> [p]erhaps your company is not aware that others tie up to the buoy, we realize this fact, but you are responsible for any violations caused by these moored barges. Please find means to keep moored barges out of the channel before we have an accident or we will be forced to seek removal of this mooring.

Buchanan Aff., Ex. F.

In February 1983 Buchanan and Sheridan jointly filed an application for a formal permit from the U.S. Army Corps of Engineers (the Corps) that would authorize Buchanan to maintain its mooring in Stamford Harbor. Prior to issuing its response to this application, the Corps wrote to various companies that had been using the mooring, informing them that the buoy had not been authorized by the required Corps permit and that "under certain conditions vessels moored to this buoy encroach into the authorized Federal channel and obstruct navigation." *Id.*, Ex. G. The Corps cited sections 10 and 15 of the federal Rivers and Harbors Act, 33 U.S.C. §§ 403 and 409, as laws prohibiting the unauthorized obstruction of navigable waters. *See id.*

In May 1983 Sheridan issued Buchanan a new mooring permit. On November 3, 1983 the Corps issued to "City of Stamford Harbormaster (Buchanan Marine)," a permit to retain and maintain the mooring buoy at a specified location in Stamford Harbor. *Id.*, Ex. J. As "Special Conditions" to the holding of this permit, the Corps limited authorized use of the mooring to four barges at one time, and prohibited vessels using the mooring ever to intrude into the "Federal Navigation chan-

nel." Sheridan, not Buchanan, signed this permit as "permittee."

On June 18, 1984 Buchanan sent mailgrams to various towing companies, including McCormack, stating that

> Effective immediately any permit authorization to use the Stamford mooring is hereby revoked. Any violations will be reported to the Corps of Engineers and Coast Guard. We are sorry for these necessary steps but because of the abusive use of the mooring we are in danger of having our permit permanently revoked.

*Id.*, Ex. K.

According to Buchanan, on November 5, 1985 McCormack tied two barges to a Buchanan barge that was secured to another Buchanan barge fastened to the mooring. The weight of the barges caused the outermost three to break away and drift to the Greenwich Town Beach. Buchanan says it incurred costs of over $15,000 to retrieve its barge, and additional costs related to cleaning up the beach.

According to McCormack, the cause of the November 5, 1985 incident was the tying of two Buchanan barges to two McCormack barges that were already on the buoy. As stated by defendant's attorney:

> the tying of the Buchanan barge to the McCormack barges caused the incident ... which saw one McCormack barge totally destroyed and another McCormack barge heavily damaged. Further, it cost McCormack in excess of $30,-000.00 to remove the barges from the rocks, repair sea walls and repair the one (1) barge.

Affidavit of William S. Busch, Ex. B.

## II.

In order to obtain a preliminary injunction the movant must show a) irreparable harm and b) either 1) a likelihood of success on the merits or 2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the movant. *Adamsons v. Wharton*, 771 F.2d 41, 42 (2d Cir.1985). Buchanan asserts that it has made such a showing.

### A. Irreparable Harm

Buchanan claims that it will suffer irreparable harm if McCormack is permitted to continue to use the mooring because that use creates a risk that the permit will be revoked. This claim is unpersuasive for two reasons.

First, Buchanan has not shown that the revocation of its mooring permit would result in any harm besides monetary losses. Buchanan states that the mooring is of "substantial commercial importance to Buchanan" and that if the harbor master were to revoke the permit, "Buchanan would have to seriously curtail, if not eliminate, its service to Stamford customers." Memorandum of Law (Plf's Memo) at 4. Mere monetary losses do not constitute irreparable harm. *Jackson Dairy, Inc. v. H.P. Hood & Sons*, 596 F.2d 70, 72 (2d Cir.1979).

Second, there is no showing that McCormack's use of the mooring will result in the revocation of the permit. So far as the papers reveal, the only threats of permit revocation Buchanan has received have resulted from observed obstructions of navigation in the channel into Stamford Harbor. *See* Buchanan Aff. at 6; Affidavit of John M. Sheridan (Sheridan Aff.) at 4, Ex. E. Although the affidavits state that the use of the mooring by companies other than Buchanan has on occasion caused such an obstruction, Buchanan has presented no evidence that McCormack was responsible, or that it is likely to cause such an obstruction in the future. The photographs provided by Buchanan of McCormack's use of the mooring do not show any blockage of the channel, *see* Birk Aff., Exs. A–D, and no other evidence singles out McCormack as causing such blockages as have occurred.

### B. Likelihood of Success on the Merits or Sufficiently Serious Grounds for Litigation and a Balance of Hardships

Even if Buchanan had shown irreparable harm, a preliminary injunction would be inappropriate as it has failed to show either 1) a likelihood of success on the merits or 2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly on its side.

Buchanan asserts that the court should issue a preliminary injunction pursuant to section 10 of the Rivers and Harbors Act (the Act), 33 U.S.C. § 403 (1986). That section prohibits "[t]he creation of an obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States." In *California v. Sierra Club*, 451 U.S. 287, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981), the United States Supreme Court determined that this section does not give rise to a private right of action. *See also Sierra Club v. United States Army Corps of Eng'rs*, 701 F.2d 1011 (2d Cir.1983). The Court reached its holding in *California v. Sierra Club* by applying the test for identifying a private right of action set out in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), which requires, in part, determining whether the plaintiff is a member of a class for whose "especial benefit" the statute sued under was enacted. *See id.* at 78, 80–82, 95 S.Ct. at 2087, 2089.

Buchanan tries to distinguish *Sierra Club* on the ground that plaintiffs there were an environmental organization and two private citizens, whereas Buchanan is "the intended beneficiary of a special permit issued" pursuant to section 10, who has therefore "suffered a special injury" from the statute's alleged violation. Plf's Memo at 8–10. The Court in *Sierra Club* expressly found, however, that the fact that persons have suffered a "special injury" from the violation of a law does not mean that law was enacted for their "especial benefit." *See* 451 U.S. at 294–95, 101 S.Ct. at 1779–80. The Court stated that to reason that "any person who would be 'especially harmed' by an unauthorized obstruction was an especial beneficiary of the Act" would make the "especial beneficiary" factor "meaningless." The question is "not simply who would benefit from the Act, but whether Congress intended to confer federal rights upon those beneficiaries." *Id.* at 294, 101 S.Ct. at 1779 (citing *Cannon v. University of Chicago*, 441 U.S. 677, 690–93 n. 13, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979)).

Applying the "especial benefit" test to section 10, the Court in *Sierra Club* determined that Congress did not intend the section to benefit any particular class, it being "the kind of general ban which carries with it no implication of an intent to confer rights on a particular class of persons." *Id.* This decision and that in *Sierra Club v. United States Army Corps of Eng'rs, supra,* control the present case. Earlier lower court opinions cited by Buchanan that take a contrary view are no longer authoritative.

 Buchanan does not suggest in its brief any body of Connecticut law as the basis for its claim to a preliminary injunction. The Stamford harbor master, Sheridan, says in his affidavit that he "does not have the resources to police the mooring and keep barges of unauthorized companies from using the mooring." Sheridan Aff. at 5. This hardly constitutes a legal ground to justify a federal court sitting in Brooklyn in undertaking to police a mooring in Stamford, Connecticut.

Buchanan's motion is denied. So ordered.