ADNAN VAROL, M.D., P.C., Psychiatric Services, P.C., J.T. Aills, M.D., P.C., Erol Ucer, M.D., P.C., K.V. Mathew, M.D., P.C., James T.S. Rhyee, David Lee, Kang Kwon, Wayne A. Swart, Jae Chul Kim, and Tai K. Kang, Plaintiffs,

v.

BLUE CROSS AND BLUE SHIELD OF MICHIGAN, a Michigan Non–Profit Health Care Corporation, Defendant.

Civ. A. No. 88 CV 40095 FL.

United States District Court,
E.D. Michigan, S.D.

March 2, 1989.

---

Robert Segar, Flint, Mich., for plaintiffs.

Lisa Sewell DeMoss, Joseph W. Murray, Detroit, Mich., for defendant.

Jordan Rossen, Gen. Counsel, Daniel W. Sherrick, Associate Gen. Counsel, Detroit, Mich., for Intern. Union, UAW amicus curiae.

Bodman, Longley & Dahling by Theodore Souris, Charles N. Raimi (Daniel G. Galant, General Motors Corp., Detroit, Mich., of counsel), for General Motors Corp., amicus curiae.

## SUPPLEMENTAL BRIEF OF GENERAL MOTORS CORPORATION AND THE UAW, AMICI CURIAE, IN SUPPORT OF DISMISSAL OF PLAINTIFFS' COMPLAINT

NEWBLATT, District Judge.

### INTRODUCTION

The real skill in judging, as it is in lawyering, is in being able properly to find and articulate the issues. This does not mean merely understanding the issues raised and stated by the attorneys, but the *real* issues. They are often not the same. This becomes more and more difficult, as fine lawyers will analyze a legal problem in ways that support the result sought by their clients. This is totally proper, so long as it is not in violation of Rule 11, Fed.R. Civ.P. Not only is the selection of the issues by the lawyers a partisan matter, but also the very way lawyers state the issues may aid in arriving at the result the attorneys desire.

What has just been said is not in any way intended to reflect on the integrity of counsel in this case, which is clearly impeccable, but rather to indicate the first function of a judge in order to resolve the dispute. In this case the lawyering has been outstanding and it should be publicly acknowledged. But at the same time I want to acknowledge that their work may not have been as helpful to the Court as the system contemplates.

Thus, to rely on the issues asserted and the law argued by counsel is not enough to arrive at a correct result. It becomes oftentimes more important to strip the legalities and to reduce the dispute to the most basic elements or issues. Because of the skills of the attorneys exercised at the highest levels of their profession, more thought and "ponder" time was necessary. What follows is the result thereof.

### FACTS

While all the parties were completely true to their ethical obligations in their recitation of the facts before the Court in their briefs, the Court will, for purposes of this decision, accept those presented in the joint brief of the *Amici Curiae*, the International Union, the United Automobile, Aerospace and Agricultural Implement Workers of America and General Motors Corporation ("GM") and adopt the same herein.[1]

"A.  *Background and development of the pilot program.*

"Basic health care benefits are delivered to GM's enrollees under the General Motors Health Care Program, which is an 'employee benefit plan' subject to the provisions of the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* Under this Program, primary enrollees (GM employees, retirees or eligible surviving spouses) generally have the choice of selecting one of three health care delivery options: traditional fee for service coverage (the 'Traditional Option'), health maintenance organizations ('HMO's') or preferred provider organizations ('PPO's'). Affidavit of Beach Hall, ¶ 3.

"The psychiatric managed care pilot program which is at issue in this lawsuit applies to General Motors enrollees, non-Medicare retirees, sponsored defendants and their eligible dependents, who are employed in Genesee, Lapeer and Shiawassee counties, and who receive mental health services in those counties under the Traditional Option. The GM Health Care Program, including the Traditional Option, is administered for GM in Michigan by Blue Cross & Blue Shield of Michigan ('BCBSM') under an 'administrative services only' contract. GM reimburses BCBSM for the covered health care charges paid by BCBSM on behalf of program enrollees and GM also pays BCBSM a fee for administering the Program. Thus, all claims payment risk is retained by GM. Blue Cross provides only administrative services and not insurance coverage. Affidavit of Beach Hall, ¶ 4.

"The cost of the medical benefits by GM for its employees has sharply increased in recent years. A significant factor in the increase has been the cost of mental health benefits, which has risen as follows:

|  | Approximate cost of mental health benefits | Approximate number of people eligible for mental health benefits |
|---|---|---|
| 1984: | $70 million | 1,996,000 |
| 1987: | $83 million | 2,111,000 |
| Increase between 1984 and 1987 | 18.5% | 5.7½ |

Affidavit of Beach Hall, ¶ 5.

1.  This in no way suggests or implies that there was anything deficient in the other briefs. Moreover, for me to rewrite, for opinion purposes, a fair and direct factual recitation would be to cater to my personal ego, which has no place in the profession of judging and would do a disservice to other cases awaiting my attention.

"GM and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ('UAW'), have considered and implemented, as part of the collective bargaining agreement, a number of measures designed to control the cost increases of the GM Health Care Program. The measures adopted include predetermination programs which require prior approval of certain medical services before the Program will pay for the service. GM and the UAW have in recent years successfully implemented, as part of the collective bargaining agreement, predetermination programs requiring prior authorization for (i) most non-emergency admissions, (ii) podiatric benefits, (iii) substance abuse benefits, and (iv) benefits for certain surgical procedures. Affidavit of Beach Hall, ¶ 6.

"In light of the sharply escalating cost of benefits for mental health coverage, and the need to assure delivery of quality mental health care, the parties agreed in the health care supplement to the 1984 collective bargaining agreement to have the Corporation–Union Committee on Health Care Benefits ('CUCHCB') 'explore development of a predetermination process for psychiatric services.' *See* the 1984 Supplemental Agreement covering health care, page 215, copy attached to the affidavit of Beach Hall. As discussed below, the CUCHCB has explored this matter and approved the pilot program at issue in this lawsuit. Affidavit of Beach Hall, ¶ 7.

"Paragraph 224 of the recently negotiated 1987 collective bargaining agreement, at page 155, copy attached to the affidavit of Beach Hall, sets forth the parties' agreement for GM to provide a Health Care Program for its employees. The details of the parties' agreement concerning that Program and its administration are set forth in a Supplemental Agreement and various exhibits which are collectively referred to as the 1987 Health Care Program for its employees. The details of the parties' agreement concerning that Program and its administration are set forth in a Supplemental Agreement and various exhibits which are collectively referred to as the 1987 Health Care Program Book. Affidavit of Beach Hall, ¶ 8. Copies of the pages from that Book cited in this brief are attached to the affidavit of Beach Hall.

"Exhibit C to the 1987 collective bargaining agreement provides as follows with respect to the role of the CUCHCB:

A Committee composed of an equal number of members designated by the Union and an equal number of members designated by the Corporation has been established to study and evaluate the health care coverages provided under the Program and to engage in activities that may have high potential for cost savings while achieving the maximum coverage and service for the Program enrollees for the money spent for such coverages. * * * 1987 Health Care Program Book, p. (5). Affidavit of Beach Hall, ¶ 8.

"In the 1987 collective bargaining agreement the parties reaffirmed their agreement 'to continue to explore the development of a psychiatric managed care program including the adoption of pilot programs.' *See* the 1987 Health Care Program Book p. 206. The CUCHCB was authorized to implement pilot programs, such as the pilot program at issue in this litigation, covering psychiatric care as well as other areas 'identified as areas of inappropriate utilization.' *See* 1987 Health Care Book, pp. 188–190, quotation from paragraph IV(A). Affidavit of Beach Hall, ¶ 8.

"In recent years the CUCHCB has commissioned a number of studies on utilization of health care benefits, including mental health benefits. The CUCHCB, at a number of meetings, has discussed the concept of a psychiatric managed care pilot program and considered several proposals. CUCHCB's consideration of such a pilot program was promoted, not only by the sharply escalating cost of mental health benefits but, also, by information supplied to the CUCHCB showing improper and inefficient utilization of mental health benefits. Various proposals were presented to and considered by the CUCHCB. Pursuant to the authority granted to it in the 1984 and 1987 collective bargaining agreements and health care supplements, the CUCHCB

ultimately agreed to proceed with the BCBSM pilot program which is the subject of this litigation. It is the CUCHCB's belief that the pilot program will improve the quality of psychiatric care delivered to GM enrollees and, as well, will enhance the cost efficiency of psychiatric care by reducing inappropriate utilization. Affidavit of Beach Hall, ¶ 9.

"In the event that either GM or the UAW believes that the pilot program is not operating pursuant to the program's guidelines, or that the program is adversely affecting GM employees or their dependents, either party is free at any time to raise its concerns with the CUCHCB. The CUCHCB is composed of an equal number of GM and UAW members and it has the authority to investigate, modify or terminate the pilot program. Affidavit of Beach Hall, ¶ 10. However, the UAW International has received no complaints from UAW members concerning the pilot program. Affidavit of Patrick Killeen, ¶ 8.

B. *Plaintiffs' challenge to the pilot program.*

"In December of 1987, plaintiffs, together with other mental health providers in Genesee, Lapeer and Shiawassee counties, were invited to participate in the pilot program. The preamble to the provider agreements ultimately signed by plaintiffs and other providers clearly discloses that the providers agreed to participate in a psychiatric managed care pilot program:

WHEREAS Blue Cross and Blue Shield of Michigan (BCBSM) wishes to establish a *Psychiatric Managed Care Pilot Program* (hereafter referred to as Pilot Program) for General Motors/United Automobile Workers (GM/UAW) employees and their dependents in the Genesee, Lapeer and Shiawassee area (Tri–County Area), and

WHEREAS the Provider, a duly licensed or certified mental health care provider in the state of Michigan, *wishes to provide Covered Services to eligible BCBSM Members in accordance with the terms and conditions of this Pilot Program, and*

WHEREAS BCBSM has entered into an agreement with Preferred Health Care, Ltd. (PHC), a Connecticut corporation, to provide Pilot Program management services.... (Emphasis added.)

"Further, paragraph 2.1 of the provider agreement incorporates the pilot program's guidelines, which had been disseminated to providers in December of 1987, and it explains that the program will utilize 'pre-authorization' and 'concurrent review':

2.1 Provider agrees to furnish Covered Services to Members *in accordance with the managed care requirements and procedures of this Pilot Program as set forth in the Pilot Program Guidelines.* Such requirements and procedures shall include, but are not necessarily limited to, *preauthorization, concurrent review and retrospective review.* Provider agrees to accept reimbursement from BCBSM which shall be determined in accordance with reimbursement policies and fee schedules promulgated and periodically updated by BCBSM. (Emphasis added.)

"The provider agreement permits the provider or Blue Cross to terminate the contract at any time, with or without cause, on 30 days' notice. *See* paragraph 7.1 of the provider agreement, exhibit A to plaintiffs' complaint.

"Plaintiffs in this case are 10 of the 20 participating psychiatrists in the pilot program. Plaintiffs executed provider agreements containing the above-mentioned provisions in December of 1987, but now claim, in their complaint filed in February of 1988, that the preauthorization and managed care requirements violate a variety of state laws and deprive plaintiffs of due process. Plaintiffs also contend that 'participation in this Pilot Program is not voluntary,' plaintiffs' complaint, ¶ 11, and that '[a]t the time they signed new provider agreements, plaintiffs were not aware of all of the details or ramifications of the new program.' Plaintiffs' brief, p. 3.

"Several of the plaintiffs own or operate out-patient mental health clinics which were *not* invited to participate in the pilot

program. Two such plaintiffs, namely Dr. Swart and Dr. Forrer who owns Psychiatric Services, P.C., a plaintiff in this lawsuit, are *suing in the state court to force Blue Cross to accept their clinics as providers for the pilot program.* A copy of the state court complaint is attached as exhibit D. Thus, those plaintiffs are suing in state court to gain entry *into* the same program which they attack in this case as illegal and oppressive."

## DISCUSSION

Plaintiffs assert a number of state law claims and one claim under the United States Constitution. In Counts I and II, plaintiffs claim that the prior authorization and concurrent review procedures under the Pilot Program violate Act 350 of the Public Acts of 1980, the Michigan Non Profit Health Care Corporation Reform Act, M.C.L.A. § 550.1101, in that the requirement to obtain prior approval requires the plaintiffs to deal with unlicensed personnel of BCBSM. It is further alleged that the power lodged in BCBSM personnel to withhold approval violates Sections 502(2) and 502(3) of that statute, which require that BCBSM contracts "shall provide that the private provider-patient relationship shall be maintained" and that a "health care corporation shall not restrict the methods of diagnosis or treatment of professional health care providers who treat members." Plaintiffs claim that the pilot program "impinges on a provider's utilization of his own best judgment in treating patients ... and transfers to BCBSM the right to have significant and, perhaps, dominant influence in deciding what shall be accepted as the correct diagnosis and the proper treatment." Plaintiffs' brief in response to defendant's motion to dismiss, p. 33. Plaintiffs' theory is that the pilot program provides powerful economic incentives for a physician to disregard his best judgment at the behest of one not licensed to render medicine [sic] and "is in direct contradiction to the policy of this state with respect to this relation-

ship." Plaintiffs' brief, pp. 34, 35.

In support of these theories, plaintiffs argue in Count IV that the requirements of the Pilot Program compel the plaintiffs to delegate delivery of health care services improperly to BCBSM's personnel, who are unlicensed to provide health care services. Plaintiffs argue that it is their function to deliver medical services and this delegation is in violation of the Public Health Code, MCLA §§ 333.16215 and 333.16221.

Count III asserts a claim that by the terms of the Program, the sanctions imposed on providers for a violation of the Program procedures are penalties and as such are in violation of the common law of Michigan.

In Count V, plaintiffs allege that BCBSM's personnel, exercising their power under the Program to approve, dictate to, or negotiate with plaintiffs as providers concerning assessment and treatment, with the implied power of severe economic sanctions if there is a disagreement, violates MCLA §§ 333.17001 and 333.17011, as such power constitutes the practice of medicine by unlicensed persons.

Plaintiffs' constitutional claim will be set aside for the moment, to deal with defendant's claims that (a) such state laws are preempted by The Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.*, and (b) that no private cause of action exists under either the Public Health Code or Act 350. Looking at the Pilot Program not as it may be working in its opening stages (as asserted in the affidavits attached to plaintiffs' complaint), but as the documents show it is designed to work, that which follows applies.[2]

■ The Court now concludes that all of plaintiffs' state law claims are preempted by ERISA. Section 514(a) thereof provides that ERISA "shall supersede any and all state laws insofar as they may now or hereafter relate to any employee benefit plan...." Section 514(c) provides that for "purposes of this section (1) the term 'State

---

2. This is appropriate because this matter is before the Court on the Motion to Dismiss, which is generally a motion based on the underlying papers. Moreover, plaintiffs' attacks are based primarily on the written requirements of the Program.

law' includes all laws, decisions, rules, regulations or other State action having the effect of law,...." State law includes the state common law. *Pilot Life Insurance Co. v. Dedeaux*, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987). While there have been many questions raised concerning the scope of preemption, it appears there is little question of its applicability here, for this program is without question an employee benefit plan and the claims based on Michigan law would be preempted. *Metropolitan Life Insurance Co. v. Massachusetts*, 471 U.S. 724, 105 S.Ct. 2380, 85 L.Ed. 2d 728 (1985); *Kentucky Laborers District Council Health and Welfare Fund v. Hope*, 861 F.2d 1003 (6th Cir.1988). Without question, plaintiffs' claims here relate to the Plan and require a plan analysis. Thus they are preempted.

The Court also concludes that the exceptions to preemption do not apply, since these state law claims do not have a "remote and tenuous" connection with the benefit plan, but go directly to the essence of the plan—the preauthorization and managed care requirements. *Authier v. Ginsberg*, 757 F.2d 796 (6th Cir.), *cert. denied* 474 U.S. 888, 106 S.Ct. 208, 88 L.Ed.2d 177 (1985). This is because the delivery of health care services is not solely the concern of the state. Moreover, the Program was arrived at through the collective bargaining process and approved jointly by GM and the U.A.W. for the purpose of improving the quality of psychiatric care delivered to GM employees who are U.A.W. members and to reduce inappropriate and excessive utilization of psychiatric care. While it may appear that this case represents a fight between plaintiffs and BCBSM, two parties who are not related directly to the employee-benefit plan, this is only superficially true. It is only because the Plan and its provider agreements require these parties to be in contact. Plaintiffs are providers of services under the Plan; BCBSM is the administrator of the Plan and thus the legal battle was drawn by plaintiff providers under the Plan suing the party with whom they contracted to be paid for services. Nevertheless, the fact is that BCBSM is acting as the administrator

of the Plan and the provider contracts between plaintiffs and BCBSM are merely the means for carrying out the benefit plan agreed to between GM and the U.A.W. And, finally, the Court rejects plaintiffs' claim that the effect of this suit on the Plan is only incidental. If successful, plaintiffs would gut the Plan and its essential purpose, preauthorization and concurrent review to enhance efficiency and reduce unnecessary and excessive utilization.

Plaintiffs claim to be exempt from preemption by ERISA under the exemption in § 514(b)(4) thereof, 29 U.S.C. § 1144(b)(4), for "any generally applicable criminal law of a State." Plaintiffs claim that the Michigan Public Health Code contains criminal sanctions for certain violations. Even if an implied cause of action were to exist, it would not prevent preemption, as it is not a generally applicable criminal law.

■ Completely aside from preemption, the Court is persuaded as to Counts I and II, that §§ 502(2) and (3) of the Non Profit Health Care Corporation Reform Act do not provide a private cause of action for their breach. Rather, the statute provides that the Attorney General may bring an action to enjoin violations. *Rayford v. City of Detroit*, 132 Mich.App. 248, 347 N.W.2d 210, *lv. denied*, 419 Mich. 938 (1984); *California v. Sierra Club*, 451 U.S. 287, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981). The statute allows individuals to bring an action against the State Attorney General to compel that official to enforce the Act. This implies that no other private remedy exists.

■ The Court concludes also that no private cause of action exists under the Michigan Public Health Code, M.C.L.A. §§ 333.16221 and 333.17011, as claimed in Counts IV and V.

Turning, however, to the actual merits—the direct challenge that the Plan's preauthorization requirement violates Act 350 and the Public Health Code—plaintiffs essentially claim that requiring preauthorization interferes with the plaintiffs' "right" to determine methods of diagnosis and treatment and would result in the unautho-

rized practice of medicine by BCBSM personnel. As the defendant and Amici point out, BCBSM personnel can approve a plaintiff's proposed treatment, but cannot reject it. If the BCBSM personnel cannot or do not approve the proposed treatment, the matter is referred to a staff psychiatrist, who discusses the matter with the provider or treating psychiatrist before a decision may be made that the proposed service is not medically necessary. If no approval to the provider's proposed treatment is then given, the treating psychiatrist can appeal to the Physician Director and then to an independent review organization.

As the Amici point out, the purpose of the Pilot Program is to determine in advance whether the GM plan will pay for the proposed treatment. *Whether or not the proposed treatment is approved, the physician retains the right and indeed the ethical and legal obligation to provide appropriate treatment to the patient.* Thus, there is no *direct* interference with the physician-patient relationship nor in the treatment rendered.

But plaintiffs claim that when there is a threat that the physician will not be paid or fully paid because approval has been withheld, the physician will be influenced unfairly and improperly to render treatment other than what the physician in good faith believes should be rendered; and thus, although the influence is indirect, the treatment is influenced improperly because the Plan injects BCBSM into the physician patient relationship and in the selection of the treatment. Plaintiffs say that decisions as to payment influence, in fact, decisions concerning actual treatment and thus the laws are *in effect* violated.

The Amici respond, and the Court completely concurs, that the Program in no way prevents providers from obtaining full payment even for rendering services that are not concurrently reviewed or preapproved. If the treating psychiatrist renders the service, that psychiatrist can still obtain 80 percent of his fee directly from BCBSM and collect the balance from the patient. So denial of approval does *not* have the effect plaintiffs have urged; it merely changes from whom providers collect the 20 percent.

But suppose it did; what then? There are two points to be stressed here. First, these psychiatrists have joined this Plan. Having sought to be members and contractually agreed to be members, how can they now be heard to challenge the provisions to which they agreed? How can they voluntarily enter a contract and then challenge its terms? And if challenged, why would the contract not simply be void? How can plaintiffs challenge only the provisions they do not like and ask the Court, in effect, to modify the contract to their liking? Plaintiffs do not address this.

But the most persuasive argument against the plaintiffs, it seems to me, is the argument plaintiffs themselves assert. Plaintiffs say, in effect, "Irrespective of any obligation I have to my patients and to my profession, my judgment as to what is in the best interests of my patients will not be determined by the exercise of my medical judgment, but by how much I will be paid for my services." Plaintiffs are saying in effect, "Since I am weak in my resolve to afford proper treatment, BCBSM's preauthorization program would induce me to breach my ethical and legal duties, and the Court must protect me from my own weakness." In other words, protect me from my own misconduct. This is strange stuff indeed from which to fashion a legal argument.

After all, the program is designed to make certain that only medically necessary services are provided and paid for. This is a legitimate objective, whether applied to a post-service reimbursement program or a concurrent review and preauthorization program. *If the same critera* to determine medical necessity were applied in a program based on a post-service audit and the BCBSM claim for repayment for unnecessary treatment were to be made after the services were rendered, no one would claim it violated any of the laws cited by plaintiffs. As a matter of fact, that is precisely what the plaintiffs are urging here. If the criteria for determining medical necessity are the same, why would a concurrent re-

view or preauthorization program be illegal?

Because the program is a Pilot Program, it may have some problems and it may even ultimately prove unsuccessful. Nevertheless, that cannot provide a basis for a court to prevent its full adoption and implementation. Cost containment in any program must deal with policing the necessity of the services rendered and payment therefor. GM and the U.A.W. are entitled to join together to make that effort. And it appears altogether inappropriate for the plaintiffs to say that the program will induce them to breach their duties to their patients. This, of course, is also a full answer to any substantive due process claims plaintiffs may make on the basis that the program is arbitrary, capricious, or irrational. *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978).

Turning lastly to plaintiffs' constitutional claims, these are easily disposed of, for there is no state action here. BCBSM is not a state agency nor does it act for the state. In this case, it acts as the agent for the two contracting parties, the U.A.W. and GM. Even if there were to be state action, the provider contracts signed by each of the plaintiffs establish what their rights are—and those agreements provide that plaintiffs will be paid by BCBSM if the preauthorization and concurrent review procedures of the program are followed. Moreover, those agreements provide an elaborate appeal procedure for plaintiffs if they should be aggrieved by BCBSM's decision. The parties cannot point to any procedural due process violation per *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), nor to any property interest per *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). The Motion to Dismiss thus will be GRANTED.

SO ORDERED.